No. 25-2027

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

VIP PRODUCTS LLC,

*Plaintiff/Counterdefendant-Appellant,*

v.

JACK DANIEL'S PROPERTIES, INC.,

*Defendant/Counterclaimant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:14-cv-02057-SMM
Hon. Stephen M. McNamee, Presiding

OPENING BRIEF OF VIP PRODUCTS LLC

DICKINSON WRIGHT PLLC
Bennett Evan Cooper
David G. Bray
Vail C. Cloar
Alexandra Crandall
1850 N. Central Ave., Suite 1400
Phoenix, Arizona 85004
(602) 285-5000

Attorneys for VIP Products LLC

## TABLE OF CONTENTS

*Page*

Table of Contents..................................................................... 2

Table of Authorities ............................................................... 4

Introduction .......................................................................... 11

Statement of Jurisdiction..................................................... 12

Statement of Issues Presented............................................. 13

Statement of the Case .......................................................... 14

    A.    Proceedings Below................................................... 14

        1.    The district court initially finds trademark infringement and tarnishment..................................... 14

        2.    This Court reverses as to infringement and tarnishment, leading to entry of judgment for VIP. ................................................................ 17

        3.    The Supreme Court vacates the judgment, but clarifies the multifactor infringement test as applied to parodies. ........................................ 18

        4.    On remand, the district court finds no infringement, but finds tarnishment on a narrow ground limited to "poo" jokes........................... 19

    B.    Bad Spaniels and Jack Daniel's ............................ 22

        1.    The Bad Spaniels Story ................................ 22

        2.    Man's new best friend, "Anthropomorphic Jack" ........ 24

Standard of Review ............................................................... 28

Summary of Argument.......................................................... 29

Argument .................................................................................................. 31

I.   JDPI failed to establish the elements of its claim for dilution
     by tarnishment. ............................................................................ 31

     A.   The district court erred in finding that JDPI's marks
          were "famous" within the meaning of the TDRA. ............... 31

          1.   The TDRA requires proof that the mark to be
               protected against dilution is "famous." ....................... 32

          2.   The district court ignored the TDRA's plain
               language by failing to look past "Jack." ..................... 35

     B.   The district court erred as a matter of law and fact in
          failing to require that a "famous" mark be tarnished
          by a similar mark. ...................................................................... 42

     C.   VIP's Bad Spaniels toy did not tarnish JDPI's marks. ........ 49

II.  The district court erred by not striking down JDPI's
     tarnishment claim on constitutional grounds ............................... 56

     A.   The tarnishment cause of action constitutes
          unconstitutional viewpoint discrimination. .......................... 56

          1.   Tarnishment cannot satisfy strict scrutiny. ............... 58

          2.   Tarnishment cannot pass a commercial speech
               test. ...................................................................................... 62

     B.   The district court erred in holding that VIP waived its
          constitutional argument. .......................................................... 63

Conclusion ............................................................................................... 68

Statement of Related Cases ................................................................. 70

Certificate of Compliance .................................................................... 71

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alfwear, Inc. v. Mast-Jagermeister US, Inc.*,
2021 WL 364109 (D. Utah Feb. 3, 2021) .............................................. 34

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) .................................................................. 15

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011) ................................................................................ 60

*Armstrong v. Schwarzenegger*,
622 F.3d 1058 (9th Cir. 2010) ................................................................ 65

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) ................................................................................ 58

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
457 F.3d 1062 (9th Cir. 2006) ................................................................ 36

*Bank of Am., N.A. v. Twilight Homeowners Ass'n*,
2022 WL 822116 (9th Cir. Mar. 17, 2022) ........................................... 65

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
963 F.3d 859 (9th Cir. 2020) ........................................................... 32, 33

*Camarillo v. McCarthy*,
998 F.2d 638 (9th Cir. 1993) .................................................................. 64

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) .......................................................................... 62, 63

*Charney v. Thomas*,
372 F.2d 97 (6th Cir. 1967) .................................................................... 44

*Coach Servs., Inc. v. Triumph Learning LLC*,
  668 F.3d 1356 (Fed. Cir. 2012) ..................................................... 34, 35

*Dent v. Holder*,
  627 F.3d 365 (9th Cir. 2010) ........................................................... 50

*Dille Fam. Tr. v. Nowlan Fam. Tr.*,
  276 F. Supp. 3d 412 (E.D. Pa. 2017) ............................................ 33, 38

*Dream Palace v. County of Maricopa*,
  384 F.3d 990 (9th Cir. 2004) ......................................................... 65, 66

*Ducks Unlimited, Inc. v. Boondux, LLC*,
  2017 WL 3579215 (W.D. Tenn. Aug. 18, 2017) .................................. 34

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
  314 F.2d 149 (9th Cir. 1963) ............................................................. 28

*Greater New Orleans Broad. Ass'n v. United States*,
  527 U.S. 173 (1999) ......................................................................... 62

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
  73 F.3d 497 (2d Cir. 1996) ....................................................... 50, 51, 53

*Iancu v. Brunetti*,
  588 U.S. 388 (2019) ............................................. 30, 31, 56, 57, 61, 67

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
  599 U.S. 140 (2023) ........................................... 18, 19, 43, 53, 61

*Jimenez v. Quarterman*,
  555 U.S. 113 (2009) ......................................................................... 44

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) ......................................................................... 59

*Laserworks v. Pitney Bowes, Inc.*,
  105 F. App'x 657 (6th Cir. 2004) ...................................................... 60

*Livingston Sch. Dist. Nos. 4 & 1 v. Keenan*,
  82 F.3d 912 (9th Cir. 1996) .............................................................. 64

*Louis Vuitton Malletier S. A. v. Haute Diggity Dog, LLC,*
 507 F.3d 252 (4th Cir. 2007) ............................................................. 19

*Luv N' Care Ltd. v. Regent Baby Prods. Corp.,*
 841 F. Supp. 2d 753 (S.D.N.Y. 2012) ................................................. 34

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.,*
 703 F. Supp. 2d 671 (W.D. Ky. 2010), *aff'd,* 679 F.3d 410
 (6th Cir. 2012) ............................................................................. 33, 35

*Matal v. Tam,*
 582 U.S. 218 (2017) ............................... 30, 31, 56, 57, 58, 60, 61, 62, 67

*Metcalf v. Golden (In re Adbox, Inc.),*
 488 F.3d 836 (9th Cir. 2007) ............................................................. 67

*Mintz v. Subaru of Am., Inc.,*
 716 F. App'x 618 (9th Cir. 2017) ....................................................... 47

*Moore v. Urquhart,*
 899 F.3d 1094 (9th Cir. 2018) ........................................................... 44

*Moseley v. V Secret Catalogue,*
 537 U.S. 418 (2003) ....................................................... 45, 46, 59, 61

*Owens v. Kaiser Found. Health Plan, Inc.,*
 244 F.3d 708 (9th Cir. 2001) ............................................................. 64

*Pocket Plus, LLC v. Pike Brands, LLC,*
 53 F.4th 425 (8th Cir. 2022) ............................................................. 49

*R.A.V. v. City of St. Paul,*
 505 U.S. 377 (1992) ......................................................................... 59

*Raich v. Gonzales,*
 500 F.3d 850 (9th Cir. 2007) ....................................................... 65, 66

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ......................................................................... 59

*Retz v. Sampson (In re Retz),*
 606 F.3d 1189 (9th Cir. 2010) ........................................................... 29

*Rivera v. Anaya,*
   726 F.2d 564 (9th Cir. 1984) ...................................................... 64, 65

*Rogers v. Grimaldi,*
   875 F.2d 994 (2d Cir. 1989) ............................................................ 17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) ......................................................................... 58

*Ross v. Jones,*
   89 U.S. 576 (1874) ........................................................................... 44

*Rubin v. Coors Brewing Co.,*
   514 U.S. 476 (1995) ......................................................................... 49

*S&P Glob. Inc. v. S&P Data LLC,*
   619 F. Supp. 3d 445 (D. Del. 2022) ............................................ 33, 38

*Scott v. Kuhlmann,*
   746 F.2d 1377 (9th Cir. 1984) ......................................................... 64

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,*
   588 F.3d 97 (2d Cir. 2009) .................................. 29, 46, 51, 52

*Stone Brewing Co., LLC v. MillerCoors LLC,*
   445 F. Supp. 3d 1113 (S.D. Cal. 2020) ........................................... 38

*Street v. New York,*
   394 U.S. 576 (1969) .................................................................... 27, 58

*Thane Int'l, Inc. v. Trek Bicycle Corp.,*
   305 F.3d 894 (9th Cir. 2002) ........................................................... 34

*TrueNorth Cos. v. TruNorth Warranty Plans of N. Am., LLC,*
   292 F. Supp. 3d 864 (N.D. Iowa 2018) ........................................... 32

*United States v. Alvarez,*
   567 U.S. 709 (2012) .................................................................... 58, 60

*United States v. Kelly,*
   874 F.3d 1037 (9th Cir. 2017) ......................................................... 28

*United States v. Mercado-Moreno,*
  869 F.3d 942 (9th Cir. 2017)................................................................28

*United States v. Mohamud,*
  843 F.3d 420 (9th Cir. 2016)................................................................28

*United States v. Playboy Ent. Grp.,*
  529 U.S. 803 (2000) ...........................................................................59

*United States v. Stevens,*
  559 U.S. 460 (2010) ...........................................................................58

*Bd. of Regents ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.,*
  550 F. Supp. 2d 657 (W.D. Tex. 2008)....................................32, 33, 34

*V Secret Catalogue v. Moseley,*
  605 F.3d 382 (6th Cir. 2010).............................................47, 48, 50, 61

*Vallavista Corp. v. Amazon.com, Inc.,*
  657 F. Supp. 2d 1132 (N.D. Cal. 2008).................................................38

*VIP Prods. LLC v. Jack Daniel's Props., Inc.,*
  953 F.3d 1170 (9th Cir. 2020)...................................................17, 24, 49

*Waln v. Dysart Sch. Dist.,*
  54 F.4th 1152 (9th Cir. 2022) .............................................................59

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ...........................................................................59

*Wood v. Milyard,*
  566 U.S. 463 (2012) ...........................................................................67

## Statutes, Regulations, and Rules

15 U.S.C. § 1114................................................................................12

15 U.S.C. § 1121................................................................................12

15 U.S.C. § 1125................................................................................12

15 U.S.C. § 1125(c)......................................................................... 15

15 U.S.C. § 1125(c)(1) ............................................................... 43, 45

15 U.S.C. § 1125(c)(2)(A) ..................................................... 32, 37, 38

15 U.S.C. § 1125(c)(2)(B) ............................................................. 50

15 U.S.C. § 1125(c)(2)(C) ............................................. 13, 43, 50, 57

15 U.S.C. § 1125(c)(3)(A) ............................................................. 53

27 U.S.C. § 205.............................................................................. 49

28 U.S.C. § 1291............................................................................ 12

28 U.S.C. § 1331(a) ....................................................................... 12

28 U.S.C. § 1332............................................................................ 12

28 U.S.C. § 1338............................................................................ 12

28 U.S.C. § 1367............................................................................ 12

27 C.F.R. § 5.65(2)(b) .................................................................. 49

Fed. R. Civ. P. 5.1 ........................................................................ 66

Fed. R. Civ. P. 8 ........................................................................... 67

Fed. R. Evid. 201.......................................................................... 36

## Other Authorities

Barton Beebe, *A Defense of the New Federal Trademark
    Antidilution Law*, 16 Fordham Intell. Prop. Media & Ent.
    L.J. 1143 (2006)........................................... 33, 35, 38, 41, 46

*Committee Print to Amend the Federal Trademark Dilution
    Act: Hearing Before the Subcomm. on Courts, the Internet,
    and Intellectual Property of the H. Comm. on the
    Judiciary*, 108th Cong. (2004) ....................................... 42, 46

Theodore H. Davis, Jr., *Introduction: United States Annual Review, The Seventieth Year of Administration of the Lanham Act of 1946*, 108 Trademark Rep. 1 (2018) .......................... 62

John Gilbertson, *Blunt Advice: A Crash Course in Cannabis Trademarks*, 60 IDEA: L. Rev. of Franklin Pierce Ctr. for Intell. Prop. 502 (2020) ....................................................... 61

Zahraa Hadi, *If Disparagement is Dead, Dilution Must Die Too*, 33 Berkeley Tech. L. J. 1189 (2018) ............................................ 62

David Lenson, *Mystery Drug One*, 36 Mass. Rev. No. 1 (2006) ............. 27

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2025) ................. 33, 35, 37, 38, 41, 42, 45, 46, 55

Norimitsu Onishi, *From Dung to Coffee Brew with No Aftertaste*, N.Y. Times, Apr. 17, 2010 .................................... 54

João Carlos Pecci, *Vinicius sem ponto final* 40 (1994) ........................... 25

Lisa P. Ramsey, *Free Speech Challenges*, 56 Hous. L. Rev. 401 (2018) ................................................................ 62

Restatement (Third) of Unfair Competition § 25 (1995) ........................ 55

*Trademark Dilution Revision Act of 2005: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary*, 109th Cong. (2005) ...................................................................... 42

*Webster's Third International Dictionary of the English Language* (2002) .................................................................. 35

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (4th ed. 2025) .............................................. 64

## INTRODUCTION

This trademark parody case is before this Court for the fourth time, and the tail is wagging the dog. After the Supreme Court clarified that the traditional multifactor infringement test must account for the parodic nature of the defendant's product, the district court correctly found that VIP Products LLC's parody dog toy did not infringe Jack Daniel's Properties, Inc.'s marks because there was no likelihood of consumer confusion. Yet the court reentered its permanent injunction based on JDPI's claim of dilution by tarnishment under the Trademark Dilution Revision Act of 2006 ("TDRA"), a cause of action not recognized at common law, enacted less than twenty years ago, and litigated rarely and usually as a tag-along to an infringement claim.

In finding tarnishment, the district court failed to account for Congress's intent that tarnishment be an extraordinarily narrow cause of action. Congress sought to protect only (i) a tiny class of truly "famous" marks that were "household names," (ii) through a narrow mechanism that requires comparison of the famous mark to a similar tarnishing mark, and (iii) against likely harm to the famous mark's reputation. JDPI offered evidence only that its "Jack Daniel's" mark was famous, but it and its experts admitted that "Bad Spaniels" was neither similar nor tarnishing. What the court found tarnishing were a couple of mild jokes about dog poo that were not similar to any famous marks and unlikely to harm anything.

11

Although this Court need not reach beyond JDPI's failure to prove tarnishment, if it does it should address the unconstitutionality of the tarnishment cause of action. Unlike trademark infringement or dilution by blurring, tarnishment constitutes viewpoint discrimination in violation of the First Amendment: what tarnishes the mark's reputation is enjoinable, but what burnishes the mark's reputation is not. The first time around, the district court rejected out of hand VIP's First Amendment arguments because this is a trademark case. Now that the U.S. Supreme Court—while this case has been pending—has twice recognized the expressive nature of marks and struck down other Lanham Act provisions on the basis of viewpoint discrimination, the district court still refused to hear VIP's challenge. The court's reasoning—that VIP did not amend its complaint to allege unconstitutionality as an affirmative defense—has no basis in Ninth Circuit precedent. This Court should reverse as to waiver and, if necessary, strike down the tarnishment statute.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331(a), 1332, 1338, and 1367 because there is diversity of citizenship and the action raises claims and counterclaims under the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and pendent claims under state law. Dist. Dkt. 1. This Court has jurisdiction of this appeal from a final judgment under 28 U.S.C. § 1291.

The district court entered final judgment on February 28, 2025. 1-ER-2. VIP timely filed its notice of appeal on March 21, 2025. 7-ER-1641.

## STATEMENT OF ISSUES PRESENTED

1. The TDRA provides a cause of action for dilution by tarnishment only for "famous" marks, a small class of marks that this Court has held must be "household names." JDPI offered no evidence of fame for any marks other than its "Jack Daniel's" mark, yet the district court held that all of JDPI's marks were famous because they are on the same bottle. Did the district court err as a matter of law and fact?

2. Under the TDRA, tarnishment requires an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). JDPI and its experts conceded "Bad Spaniels" was neither similar to nor tarnishing of "Jack Daniel's," but the district court nevertheless found tarnishment because of mild poo jokes that were not similar to any famous JDPI marks. Did the district court err as a matter of law and fact?

3. The TDRA requires that, for a mark to tarnish, it must be likely to "harm the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). JDPI offered no evidence of actual reputational harm or even a consumer survey establishing the likelihood of such harm. The district court found likely harm based exclusively on the theory of JDPI's expert that any reference to poo is necessarily tarnishing when made

13

anywhere near food or beverages. Did the district court err as a matter of law and fact?

4.    While this case was pending, the U.S. Supreme Court twice struck down Lanham Act provisions prohibiting registration of certain kinds of marks because those regulations constituted unconstitutional viewpoint discrimination in violation of the First Amendment. The TDRA authorizes injunctions against marks that are likely to tarnish the reputations of famous marks, but not those that burnish such reputations, without regard to any likelihood of confusion. Is the tarnishment provision similarly unconstitutional?

## STATEMENT OF THE CASE

### A.    Proceedings Below

This case is before this Court for the fourth time. The proceedings have narrowed over time to one claim—dilution by tarnishment—and one theory of tarnishment—poo jokes. Yet the proceedings yielded the same permanent injunction against a parody dog toy that, after ten years of sales, has caused no discernible harm to JDPI.

### 1.    The district court initially finds trademark infringement and tarnishment.

The parties' dispute began when JDPI demanded that VIP stop selling its Bad Spaniels dog toy. VIP sued for declaratory relief that the toy did not infringe or dilute any trademark rights claims by JDPI in the name and mark "Jack Daniel's." Dist. Dkt. 1. JDPI counterclaimed for

trademark and trade dress infringement, as well as for dilution by tarnishment under 15 U.S.C. § 1125(c). Dist. Dkt. 12.

On cross-motions for summary judgment, the court granted JDPI's motion for partial summary judgment as to the protectability of some of its marks, and denied VIP's motion for summary judgment as to certain defenses to the infringement and dilution claims. 1-ER-90. Among other things, the district court rejected VIP's free-speech arguments, finding that "VIP's dog toy is not entitled to protection under the First Amendment because it is not an expressive work" and trademark law controlled, not the Constitution. 1-ER-98–99. The court also held that applying the multifactor infringement test presented triable issues of fact, and whether JDPI's marks were famous and whether there was tarnishment also raised triable issues of fact. 1-ER-112; 1-ER-118.

JDPI sought only injunctive relief. The district court decided the factual issues by a bench trial, Dist. Dkt. 184, and denied VIP's request to impanel an advisory jury, Dist. Dkt. 188. The court held a four-day trial in October 2017 and, the following year, issued findings of facts and conclusions of law. 1-ER-66. As to the infringement claim, the district court applied the multifactor test of *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979), and concluded that the Bad Spaniels toy was likely to cause confusion. 1-ER-88.

As to the tarnishment claim, the district court broadly and conclusorily found "that Jack Daniel's trademarks and trade dress are

famous and were famous before VIP introduced 'Bad Spaniels' in July 2014." 1-ER-71. The court referred only to "Jack Daniel's" and "the Jack Daniel's brand," without finding whether ancillary marks like "Old No. 7" were independently famous within the meaning of the TDRA. 1-ER-71–72. The court also broadly concluded that JDPI had "established the requisite similarity between VIP's 'Bad Spaniels' and Jack Daniel's trademark and trade dress" because VIP had "appropriated the Jack Daniel's trade dress in every respect." 1-ER-73.

Finally, the court found that the parody dog toy would cause "reputational harm" to JDPI's marks for two reasons: (1) the toy includes poo jokes, and "human consumption and canine excrement do not mix," 1-ER-76; and (2) the marks "are tarnished by associating them with toys, particularly the kind of toys that might appeal to children," and "Jack Daniel's is in the whiskey business" and "does not license goods that might appeal to children," 1-ER-77.[1]

The district court entered final judgment and a permanent injunction against VIP's producing, advertising, or selling the Bad Spaniels dog toy. Dist. Dkt. 262 at 6. VIP appealed. Dist. Dkt. 276.

---

[1] In the district court's 2024 amended findings now on appeal, the court abandoned that second ground, perhaps because the evidence showed that JDPI had licensed its marks for use on other kid-friendly products, including playing cards, puzzles, chessboards, t-shirts, barbecue sauce, and ready-to-eat meats. 6-ER-1473–1508; *see also* Dist. Dkt. 231-2 at 3–4; Dist. Dkt. 368 at 7–8; Dist. Dkt. 234 at 101.

### 2. This Court reverses as to infringement and tarnishment, leading to entry of judgment for VIP.

In the first appeal, this Court affirmed in part, reversed in part, and remanded for further proceedings. *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170 (9th Cir. 2020). The Court vacated the judgment as to infringement because it held that the parody toy was an "expressive work" that "communicate[d] a humorous message," triggering heightened First Amendment scrutiny under the test of *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). *VIP Prods.*, 953 F.3d at 1175. The Court further held that JDPI's tarnishment claim was barred by the statutory noncommercial-use exclusion. *Id.* at 1176. The Court remanded the case to the district court for the limited purposes of applying the *Rogers* test and entering judgment for VIP on the tarnishment claim. This Court and the full Ninth Circuit denied JDPI's petition for rehearing or rehearing en banc, and the Supreme Court denied certiorari. (No. 18-16012, Dkt. 72, 75.)

On remand, the district court concluded that JDPI's infringement claim was barred under the *Rogers* test, and it entered judgment for VIP on both the infringement and tarnishment claims. 1-ER-54; 1-ER-64–65. The district court lamented that this Court's standard "excuses nearly any use less than slapping another's trademark on your own work and calling it your own." 1-ER-64.

17

JDPI then brought the second appeal and moved the Court for summary affirmance to facilitate petitions for rehearing en banc and certiorari. No. 21-16969, Dkt. 14. The Court granted summary affirmance, No. 21-16969, Dkt. 23, and the full Ninth Circuit denied JDPI's petition for rehearing en banc, No. 21-16969, Dkt. 30, but this time the Supreme Court granted JDPI's petition for certiorari. No. 21-16969, Dkt. 33.

### 3. The Supreme Court vacates the judgment, but clarifies the multifactor infringement test as applied to parodies.

In its June 2023 opinion, the Supreme Court reversed this Court's holdings as to the *Rogers* test and noncommercial-use exclusion, and remanded to this Court for further proceedings. *Jack Daniel's Props., Inc. v. VIP Prods. LLC,* 599 U.S. 140 (2023). First, the Supreme Court held that the *Rogers* test does not apply to an infringement claim "when an alleged infringer uses a trademark … as a designation of source for the infringer's own goods." *Id.* at 153. The Court concluded VIP used "the marks at issue" as a means of "source designation" in addition to "an effort to 'parody' or 'make fun' of Jack Daniel's." *Id.*

Having rejected the *Rogers* test in that context, the Supreme Court remanded the issue of "whether the Bad Spaniels marks are likely to cause confusion." *Id.* at 161. The Court emphasized that "a trademark's expressive message—particularly a parodic one, as VIP asserts—may

properly figure in assessing the likelihood of confusion." *Id.* (citing *Louis Vuitton Malletier S. A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 265 (4th Cir. 2007)).

Second, as to tarnishment, the Supreme Court's "narrow" opinion held only that the dilution statute's noncommercial-use exclusion could not be applied if the defendant's marks were used as a designation of source for its own goods. *Id.* at 163. The Court did not address any other issues regarding the tarnishment claim.

On remand, this Court invited the parties to brief whether the Court should decide the remaining issues or remand to the district court. VIP favored this Court's resolution of the issues; JDPI urged remand. VIP specifically indicated that it intended to raise the issues now on appeal, including whether JDPI has established the elements of tarnishment and whether the tarnishment provision constitutes unconstitutional viewpoint discrimination. No. 21-16969, Dkt. 38 at 16–24. In response, the Court ordered a general remand. No. 21-16969, Dkt. 41.

> **4. On remand, the district court finds no infringement, but finds tarnishment on a narrow ground limited to "poo" jokes.**

Back before the district court, both parties represented that they did not need to reopen discovery or the factual record. Dist. Dkt. 332; Dist. Dkt. 337 at 5, 7. The district court ordered three rounds of

simultaneous briefs on cross-motions for judgment on the existing factual record. Dist. Dkt. 333. On the court's certification of the issue, the United States also submitted a brief regarding VIP's facial challenge to the constitutionality of the tarnishment statute. Dist. Dkt. No. 364. After full briefing, the court held argument in December 2024. Dist. Dkt. 373.

The following month, the district court issued its amended findings of fact and conclusions of law. 1-ER-5. The court applied the multifactor infringement test but this time concluded that, in light of the parodic nature of Bad Spaniels, the various factors flipped in significance and indicated that consumer confusion was unlikely. 1-ER-41–52. The court later entered judgment for VIP on the infringement claim.

But the district court nevertheless reentered its injunction based on the tarnishment claim. As to the fame of the marks, the district court's findings of fact never reached beyond characteristics of "Jack Daniel's" or addressed "Old No. 7" or any other mark or element of a mark similar to any purportedly tarnishing aspect of VIP's product:

- JDPI "spent hundreds of millions of dollars to promote Jack Daniel's whiskey."

- Jack Daniel's is "the best-selling whiskey in the United States since 1997," and "Jack Daniel's trademarks have been used continuously for over a century, except during Prohibition."

- JDPI's "trademarks and trade dress have been viewed by millions of Americans in movies and television programs" and featured on "Jack Daniel's" website and social media.

20

- "[B]ased on Jack Daniel's internal records, Jack Daniel's has achieved global recognition and aided consumer awareness of the Jack Daniel's brand is consistently around 98% [*sic*]."

1-ER-12–13 (citing 2-ER-175 (testimony as to 89% recognition)).

In evaluating whether VIP's allegedly tarnishing marks were similar to JDPI's famous marks, the court concluded only that "VIP appropriated Jack Daniel's trade dress in every aspect." 1-ER-13. The court rejected any legal requirement that the tarnishing mark be "correlative" to a specific famous mark, holding that "[i]t is VIP's use of Jack Daniel's marks—on a poop-themed dog chew toy—that Jack Daniel's claims tarnish its trademarks, not 'Bad Spaniels' itself when taken in isolation." 1-ER-35. Without ever addressing the TDRA's express language, the court found that the fact that "'Bad Spaniels' as a trademark does not tarnish Jack Daniel's does not also mean that 'Bad Spaniels' the dog chew toy does not." 1-ER-35.

The court limited the supposedly "tarnishing" aspects of the toy to the poo jokes. The court credited the testimony of JDPI's expert, Itamar Simonson, that "the negative associations of 'Old No. 2,' referring to defecation, and 'poo by weight'[2] would create disgust in the mind of the consumer [who] evaluates Jack Daniel's whiskey." 1-ER-16.

The court entered a final judgment and permanent injunction based solely on dilution by tarnishment. The court again enjoined VIP from

---

[2] The toy actually says "43% POO BY VOL."

"sourcing, manufacturing, advertising, promoting, displaying, shipping, importing, offering for sale, selling, or distributing, the [depicted] Bad Spaniels dog toy." 1-ER-3. This appeal followed.

### B.    Bad Spaniels and Jack Daniel's

#### 1.    The Bad Spaniels Story

Bad Spaniels was whelped in a bar. In 2013, while VIP owner Stephen Sacra and his wife, Wendy Sacra, sat at a bar waiting for dinner, he was "looking around" and thinking about "what new product can we come up with." 3-ER-487–88; Dist. Dkt. 243 at 103. Alcohol brands were a natural target for VIP's parody products because Steve and Wendy, VIP's Director of International Sales, both had robust backgrounds in alcohol marketing. Steve Sacra worked for Anheuser-Busch, in charge of the on-premises marketing for the top 40 bars in Tempe and Scottsdale, to encourage those who had reached the legal drinking age to choose the "brand they should start becoming loyal to." 3-ER-457. Wendy Sacra worked for years on promotions for Miller Brewing Company, managing all of the "promo girls for Miller" for Phoenix and surrounding areas, and then did the same job for Bacardi. 3-ER-458.

Sacra found his inspiration in a square bottle with a black label. He immediately called his graphic designer, Elle Phillips, at her home and, in a fifteen-second conversation, told her "Bad Spaniels." 4-ER-820; 3-ER-

488. She got the joke, and worked up a sketch of a funny dog toy that parodied Jack Daniel's. 4-ER-834–35; 3-ER-488.

The following year, the new Bad Spaniels toy joined a pack of parodies. 3-ER-481. VIP designs, manufactures, and sells dog toys of various materials, shapes, and sizes. Among its product offerings is a line of interactive-play toys made predominantly of injection-molded vinyl and branded Silly Squeakers®. 3-ER-469. VIP's Silly Squeakers® dog toys parody famous brands in shapes of beer, wine, soda, and liquor bottles. 3-ER-477.

In creating Bad Spaniels, Sacra's intent was "[a]bsolutely" to create a parody product and "[u]ndoubtedly" to amuse the public. 3-ER-488. In designing the Bad Spaniels parody, VIP borrowed only enough to make the joke work. Elle Phillips testified that she included "some decent similarities" because "we wanted it to be a parody of the Jack Daniel's bottle." 4-ER-841; 4-ER-843. Sacra confirmed that VIP had "no intent to make a copy" of Jack Daniel's label as "our goal is to just grab enough elements of information that has been put into your mind for you to recall the brand that we're parodying, but not to copy." 3-ER-496–97.

To accomplish the parodic effect, the Silly Squeaker® toy artistically replaced "Jack Daniel's" with "Bad Spaniels"; "Old No. 7" was parodied by "Old No. 2"; and "Tennessee whiskey" became "Tennessee carpet." Federally mandated references to alcohol content transformed into "43% POO BY VOL." with "100% SMELLY" added. The Bad Spaniels toy also

features a dominating cartoon of, in the district court's words, a "wide-eyed spaniel." 1-ER-9.



Even the district court acknowledged that Sacra's "intent behind producing the Silly Squeakers line of toys was to develop a creative parody on existing products." 1-ER-9. This Court elaborated that "VIP's purported goal in creating Silly Squeakers was to 'reflect' 'on the humanization of the dog in our lives,' and to comment on 'corporations [that] take themselves very seriously.'" *VIP Prods.*, 953 F.3d at 1172.

### 2. Man's new best friend, "Anthropomorphic Jack"

As this Court noted last time, *id.*, VIP's parody operates at two levels: skewering JDPI's sense of cultural self-importance, including the personification of "Jack" as a friend in the public imagination, and spoofing dog owners' relationship with their pets. 3-ER-477–78; 3-ER-490. The combined parodic point is best summarized in the line of

24

Brazilian poet, lyricist, and diplomat Vinicius de Moraes: "*O uísque é o melhor amigo do homem—é um cachorro engarrafado*—Whiskey is man's best friend, it's a dog in a bottle." João Carlos Pecci, *Vinicius sem ponto final* 40 (1994). JDPI has never gotten the joke.

Although Steve Sacra freely admitted that Bad Spaniels did not disparage Jack Daniel's *whiskey*—a point confirmed by the admission of JDPI's expert, Itamar Simonson, that "[n]o one would think that there's poo in the Jack Daniel's product," 2-ER-297—the parody nevertheless comments on Jack Daniel's *commercial presence*, which is something that Steve and Wendy Sacra knew well from their backgrounds in marketing some of America's most popular alcohol brands. Sacra testified he was "making a comment about Jack Daniel's," "the way they market their products," and their "having consumer influence over another person" and "taking it very seriously." 3-ER-572–73. He elaborated, "The intended message for the Bad Spaniels parody toy … is just saying, the world around you is constantly advertising to you," and "[y]ou need to be able to sit back and laugh at yourself. Whether it is someone making fun of me, or someone else, or another brand or whatever." 3-ER-494–45. Sacra added, "Not only are we parodying the actual brand, we're also poking fun at dogs. Because if you own a dog, these are the things that you experience in your relationship with a dog." 3-ER-530. He testified that "the Silly Squeakers line … reflects back on the humanization of the dog in our lives," in the spirit of "the picture of the dogs playing poker" or




"people who take videos of their dogs who can actually bring them beers." 3-ER-477–78. Consumers reviewing the Bad Spaniels toy on Amazon reflect this in the dog photos they submit with their reviews. Dist. Dkt. 231–22.

JDPI's testimony demonstrated that the "Jack Daniel's brand" is focused on the idea of "Jack"—and how seriously the brand takes itself. The Global Brand Director for JDPI's parent, Phillip Michael Epps, testified that the Jack Daniel's "brand has found its way naturally into pop culture, into movies, and has been adopted by musicians." 2-ER-180–81. He emphasized the anthropomorphism of their whiskey that the company has long promoted in its advertising: "there's a real familiarity about Jack, and people ask for a Jack. There's almost a personal relationship with some of our drinkers." 2-ER-185; Dist. Dkt. 229-6 at 27 (advertisement showing Jack Daniel's bottle, bar patrons, and slogan "In any bar in America, you know someone by name").) As explained below in greater detail, the



brand focuses on asking for "Jack Daniel's," "Jack," or even "JD." *See infra* pp. 35–36.

At trial, executives like Epps glowed with pride over people's love of "Jack," testifying that the brand's "very loyal consumers … will even go to the extent of tattooing themselves with a Jack Daniel's label or logo." 2-ER-211. JDPI's then-President, David Gooder, echoed that "there are people all over the world who feel … like they have been injured when Jack's been injured." 2-ER-388.

As Epps suggested, the role of "Jack" in influencing "pop culture" and "musicians" shows how it positions "Jack" as man's *new* best friend. *See* Dist. Dkt. 234 at 56. One essayist noted that "Jack Daniels" stands among "images of patriarchal comfort," as "alcohol is often anthropomorphized, usually as a man." David Lenson, *Mystery Drug One*, 36 Mass. Rev. No. 1, at 43–44 (2006). Musicians' odes to "Jack" bear this out:

- George Thorogood and the Destroyers rocked, "Yeah, the other night I laid sleeping/And I woke from a terrible dream/So I caught up my pal Jack Daniel's/And his partner Jimmy Beam." *I Drink Alone* (1985).

- David Allan Coe sang, "Jack Daniels, if you please/Knock me to my knees/You're the only friend/There's has ever been that didn't do me wrong." *Jack Daniel's, If You Please* (1978).

- Country superstar Miranda Lambert crooned, "I fell in love with Jack Daniels again/He's the best kind of lover that there is/I can have him when I please/He always satisfies my needs." *Jack Daniels* (2001).

Such lyrics echo Gooder's testimony that the "brand values of the Jack Daniel's mark" include "masculinity, but in a way that is appreciated and connected with women as well." 2-ER-387–88.

The testimony by JDPI's executives was long on "Jack Daniel's" but short on anything else. They made *no mention* of "Old No. 7" or any other aspect of the Jack Daniel's trademark that is the subject of a poo joke by VIP. Rather, JDPI Licensing Manager Tobias Roush added that the Bad Spaniels toy is "a negative toward our brand and an icon that we have all worked so hard to protect." 2-ER-241–42. He added that, "in order to make a comment or poke fun at the iconic Jack Daniel's brand, you need to be a licensee to do that"—that is, "[i]f the brand would allow you to do that." 2-ER-264.

## STANDARD OF REVIEW

This Court reviews de novo all questions of law, including the interpretation of federal statutes, *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017), and the constitutionality of federal statutes, *United States v. Mohamud*, 843 F.3d 420, 432 (9th Cir. 2016).

This Court reviews findings of fact for clear error. *United States v. Mercado-Moreno*, 869 F.3d 942, 959 (9th Cir. 2017). In trademark cases, this Court will review findings of fact as to individual statutory factors for clear error, but will review de novo the final balancing of those factors. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 152 (9th Cir. 1963) (explaining that "[t]he inference to be drawn from the

28

undisputed facts here are 'derived from application of a legal standard,'" and "partakes more of the character of a conclusion of law than of a finding of fact"); *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009) (likelihood of dilution). "[A] factual determination is clearly erroneous if it is illogical, implausible, or without support in the record." *Retz v. Sampson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

## SUMMARY OF ARGUMENT

1. The district court erred as a matter of law and fact in finding that JDPI satisfied the elements of tarnishment. First, JDPI did not establish that any of its marks beyond "Jack Daniel's" itself was "famous" under the TDRA, i.e., a "household name" to the general population, rather than a "niche market" of whiskey drinkers. JDPI's witnesses talked about the recognition of the "Jack Daniel's" brand, and they did not even mention ancillary marks like "Old No. 7," which appears on only some "Jack Daniel's" whiskey products.

Second, this failure of proof is fatal because the TDRA requires a narrow mechanism of tarnishment—"association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." The only famous mark is "Jack Daniel's," and the only similar mark on VIP's toy is "Bad Spaniels." But JDPI's witnesses admitted that "Bad Spaniels" is neither similar nor tarnishing; JDPI's survey expert even used "Bad Spaniels" on the confusion-survey *control*.

Third, JDPI offered no competent evidence of tarnishment, i.e., likely harm to its famous mark's reputation. The Bad Spaniels toy has been in the market for ten years, but JDPI offered no evidence of reputational harm. JDPI did not even offer survey evidence, which is recognized as a standard means of proving tarnishment. JDPI offered only the testimony of a marketing professor who opined it was "common sense" that all references to excrement in connection with comestibles is "disgusting," without accounting for Bad Spaniel's use of mild euphemisms as part of a parody dog toy that did not even mention Jack Daniel's (or, for that matter, any food or beverage).

2.    The TDRA's tarnishment provision amounts to unconstitutional viewpoint discrimination in violation of the First Amendment. While this case was pending, the Supreme Court in the *Tam* and *Brunetti* cases struck down two Lanham Act provisions barring registration of certain categories of marks based on whether they were derogatory, immoral, or scandalous, reasoning that these "happy-talk clauses" constituted viewpoint-based discrimination. Constitutional scholars have recognized that the tarnishment statute will be the next to fall under *Tam* and *Brunetti*. This Court can avoid that result here by reversing the judgment on statutory grounds.

The district court declined to consider the VIP's constitutional challenge on the ground that VIP had not raised it in the pleadings. But this Court has not applied the pleading rules in this manner. Rather, the

Court has allowed affirmative defenses and similar issues to be raised by later motion—or even on appeal in the first instance—if there is no prejudice to the other party and no further factual development is necessary, or if there was intervening legal developments. All of these circumstances were present here: *Tam* and *Brunetti* were rendered long after the close of pleadings (and *Brunetti* was decided after this case was on appeal); JDPI had ample notice of the argument; the issue was purely legal; and the district court had full briefing by the parties and the United States.

ARGUMENT

## I.  JDPI failed to establish the elements of its claim for dilution by tarnishment.

### A.  The district court erred in finding that JDPI's marks were "famous" within the meaning of the TDRA.

The district court's foundational error was its conclusory finding that all of JDPI's trademarks and trade dress are "famous" within the meaning of the TDRA and thus eligible for protection against dilution by tarnishment. While the "Jack Daniel's" mark may be famous, that is not enough because, as shown in part I(B), JDPI has not even claimed that VIP tarnished "Jack Daniel's" by use of a mark "similar" to it that constitutes a poo joke. Correctly understood, JDPI's tarnishment claim ultimately depends on its proving that its "Old No. 7" mark—the only one that is "similar" to any of VIP's junior parodic poo marks—is famous. But

there was no such finding, or evidence to that end. The district court engaged in legal error by adopting a novel theory of extending penumbral dilution protection to nonfamous marks on the ground that they appear on some (but not all) of the same labels as "Jack Daniel's," and are thus part of the "Jack Daniel's brand." But that is not what the TDRA provides, and that is directly contrary to Congress's intent to limit dilution protection to famous marks.

### 1. The TDRA requires proof that the mark to be protected against dilution is "famous."

The TDRA extends dilution protection only to a small group of exceptional marks. The 2006 statute requires that the mark be not just strong, but actually "famous," which it defines as "widely recognized by the *general consuming public* of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added).

This Court and others have recognized that this statutory language means that the purportedly tarnished mark must qualify as a "household name." *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 871 (9th Cir. 2020). Courts have cited as illustrative famous marks "Buick or KODAK," *Bd. of Regents ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 678 (W.D. Tex. 2008), "Coca-Cola, Apple or Budweiser," *TrueNorth Cos. v. TruNorth Warranty Plans of N. Am., LLC*, 292 F. Supp. 3d 864, 871 (N.D. Iowa 2018), and "Nike, Pepsi,

Nissan, Audi, Hershey's or Victoria's Secret," *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 699 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012).

But that class of marks is an exclusive one—after enactment of the TDRA, "niche fame can no longer make a trademark eligible for protection against dilution." *Blumenthal Distrib.*, 963 F.3d 85 at 870 (reversing jury finding that "Eames" chair product design was "famous"); *Bd. of Regents*, 550 F. Supp. 2d at 678 (University of Texas "longhorn" logo is not famous outside football fans); *S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 465–67 (D. Del. 2022) (S&P not "famous" for financial services); *Dille Fam. Tr. v. Nowlan Fam. Tr.*, 276 F. Supp. 3d 412, 437 (E.D. Pa. 2017) (BUCK ROGERS not "famous"). "[T]he 2006 Revisions contracted the category of marks that could be 'famous' by eliminating the possibly of 'niche fame'" for products "famous only to a niche segment of persons defined by product line or territory." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:101 (5th ed. 2025). As Professor Barton Beebe has succinctly explained, "if the finder of fact is a long-time resident of the United States and has not heard of the mark or is only vaguely familiar with it, then the mark is probably not 'famous' for purposes of antidilution protection." Barton Beebe, *A Defense of the New Federal Trademark Antidilution Law*, 16 Fordham Intell. Prop. Media & Ent. L.J. 1143, 1158 n.86 (2006).

In considering whether marks were famous for dilution purposes, courts have rejected fame within such "niche markets" as "the baby product market," *Luv N' Care Ltd. v. Regent Baby Prods. Corp.*, 841 F. Supp. 2d 753, 758–59 (S.D.N.Y. 2012); "college football fans," *Bd. of Regents*, 550 F. Supp. 2d at 78; "people interested in hunting, fishing, and related outdoor activities," *Ducks Unlimited, Inc. v. Boondux, LLC*, 2017 WL 3579215, at *31, *36 (W.D. Tenn. Aug. 18, 2017); and "outdoor apparel," *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, 2021 WL 364109, at *10 (D. Utah Feb. 3, 2021). And even strong marks that are very well known are not necessarily "famous" within the TDRA's restrictive definition. *See, e.g.*, *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) (holding COACH not famous for leather handbags and other goods). Indeed, this Court applied a restrictive standard for fame even under the 1995 Federal Trademark Dilution Act, holding that TREK was not a famous mark for bicycles. *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002).

Distilled spirits have a tougher time escaping the niche market, particularly when one must see the bottle to identify an ancillary mark like "Old No. 7." By their nature, alcoholic beverages are advertised and sold only to a particular market of adults who drink. Thus, as one Kentucky federal court has explained, recognition within the "niche market of whisky drinkers" is not enough: the red dripping-wax seal on the Maker's Mark bourbon bottle was not "famous" within the meaning

of the TDRA, even though Maker's Mark whiskey was a "terrifically strong and focused brand." *Maker's Mark*, 703 F. Supp. 2d at 699.

Finally, unlike the "strength" of a trademark for purposes of an infringement claim, "fame" for purposes of a dilution claim is a higher and less-flexible bar. Like pregnancy, "fame for dilution is an either/or proposition—it either exists or does not." *Coach*, 668 F.3d at 1373. Moreover, commentators agree that, "if a court is in doubt on this issue, it should rule that the mark is not famous." McCarthy, *supra*, § 24:104; (agreeing with Beebe, *supra*, at 1158). "This is consistent with Congress' goal in the TDRA to restrict the subject matter of antidilution protection only to truly deserving marks." Beebe, *supra*, at 1158.

### 2. The district court ignored the TDRA's plain language by failing to look past "Jack."

The district court's analysis of the fame of the mark extended only to the "Jack Daniel's brand," and the court failed to make any findings as to whether "Old No. 7" or anything other than "Jack Daniel's" were famous *within the TDRA's narrow meaning*. It didn't because it couldn't: JDPI offered no evidence.

This insufficiency in the evidence and the district court's failure to acknowledge it are critical because of the seemingly unprecedented nature of this tarnishment claim. JDPI is not suing because VIP made a poo pun about "Jack Daniel's"—it did not title the parody toy "Cack Daniel's," for example. *See* Cack, *Webster's Third International*

*Dictionary of the English Language* 311 (2002) (defining "cack" as "dung" or "to discharge excrement"). Rather, the only poo reference that is similar to *any* mark—famous or not—is "Old No. 2," which parodies "Old No. 7." But "Old No. 7" is an *ancillary* mark that appears on the labels of some, but not all, "Jack Daniel's" products. *See infra* pp. 39–40. There is no evidence that even people who are familiar with "Jack Daniel's" recognize or remember that some bottles also say "Old No. 7." Nor is there evidence that consumers order—or are told in advertising to order—"Old No. 7" at a bar, in the way they ask for "Jack Daniel's," "Jack," or perhaps even "JD."[3] By contrast, in an ordinary dilution case, the allegedly tarnishing mark is similar to and aimed at the primary mark of the plaintiff—not something else that appears on the label.

Here, the district court erroneously reasoned that it need not determine whether "Old No. 7" was famous. The court stated that "even if the Court were to conclude that 'Old No. 7' is not a famous trademark for dilution purposes," it could still find tarnishment because it is enough that VIP used *any* mark that harmed Jack Daniel's reputation. 1-ER-35. As shown in part I(B) below, the district court was wrong as a matter of law.

---

[3] U.S. Trademark Reg. No. 77550947 (registration of JD trademark for distilled spirits). This Court should take judicial notice of this registration under Fed. R. Evid. 201. *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1064 n.2 (9th Cir. 2006) (taking judicial notice of registered trademarks).

The district court thus embraced a conceptual failure of proof infecting its treatment of all of the statutory "fame" factors. To determine "fame," the TDRA permits courts to "consider all relevant factors," including four specified in the statute: (1) "duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "extent of actual recognition of the mark"; and (4) "[w]hether the mark was registered." 15 U.S.C. § 1125(c)(2)(A)(i)–(iv). The statute offers dilution protection only to famous *marks*—not groups of marks vaguely described as "brands."

In applying these statutory factors, the court did not look to individual marks, but instead to some greater "brand" totality. For most of its factual findings favoring JDPI, the district court relied on testimony by Philip Michael Epps, but Epps did not testify regarding *any* trademark in particular; his entire testimony speaks instead of the Jack Daniel's "brand." 2-ER-172; 2-ER-174–76. For example, Epps never even mentioned consumer recognition of "Old No. 7."

### a. There is no evidence of the extent of actual recognition of any ancillary marks.

In applying the statutory factors, it is widely recognized that the third-listed factor, the "extent of actual recognition of the mark," is the *only* factor that "goes to the heart of the matter." McCarthy, *supra*, § 24:106. The other factors are either "only circumstantial evidence" of

actual recognition or disconnected from the high bar for fame. *Id.* As Professor Beebe notes, the other factors "are mere formal distractions from what should in all events be a purely empirical—and, ideally, a survey-based—analysis." Beebe, *supra*, at 1159; *see Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132, 1138 (N.D. Cal. 2008) (finding mark not famous, despite significant advertisements and longstanding use and registration of mark, in part because plaintiff "has not provided any survey evidence of actual recognition").

There is no evidence that anything other than the name "Jack Daniel's" is actually recognized as a household name. Fame for dilution "requires an evaluation or measure of exactly just how widely known and famous" the particular mark at issue is. McCarthy, *supra*, § 24:106. Put in numerical terms, the required level of fame for dilution is typically quantified at *75% awareness* by the "general consuming public of the United States." *Id.*; *see Stone Brewing Co., LLC v. MillerCoors LLC*, 445 F. Supp. 3d 1113, 1148 (S.D. Cal. 2020) (Stone Brewing beer brand not famous because it is "not known even by a majority" of the public); *Dille Family Tr.*, 276 F. Supp. 3d at 436 (finding 63% aided recognition of the science fiction character Buck Rogers in a survey insufficient for a finding of fame); *S&P Glob.*, 619 F. Supp. 3d at 467 (finding 67% aided recognition rate of the S&P mark from the financial sector to be insufficient).

To support its conclusion of fame, the district court cited only Epps's testimony that, for a six-month period in 2017, "our total *brand* awareness is 89%." 2-ER-175 (emphasis added). That figure came from JDPI's internal records, 2-ER-175; no survey was ever produced. Even if that number is sufficient for "Jack Daniel's," no evidence suggests that any significant percentage of general consumers recognizes "Old No. 7" or anything else on the bottle.

The record indicates that Epps's testimony regarding "brand" awareness speaks to *Jack Daniel's* products generally—and not the specific recipe identified as "Old No. 7." JDPI introduced at trial Brown Forman's 2017 Form 10K, which identifies as its "Principal Brands" not only "Jack Daniel's Tennessee Whiskey" (with no mention of "Old No. 7"), but *nine more* "Jack Daniel's" products. 6-ER-1540. Those products include Jack Daniel's Tennessee Honey, in addition to Jack Daniel's RTDs, Gentleman Jack Rare Tennessee Whiskey, Jack Daniel's Tennessee Fire, Jack Daniel's Single Barrel Collection, Jack Daniel's Winter Jack, Jack Daniel's Sinatra Select, Jack Daniel's No. 27 Gold Tennessee Whiskey, and Jack Daniel's Tennessee Rye. This partial image from the Form 10K shows how "Jack" dominates "Old No. 7," which



appears on only one of the three pictured "Jack Daniel's" products. 6-ER-1523.

The only conceivable meaning of the word "brand" in Epps's testimony, then, is of the *Jack Daniel's* brand, complete with its panoply of products. *See, e.g.*, 2-ER-173. Such broad strokes do not satisfy the exacting standard of fame under the TDRA.

**b. The advertising and sales data for "Jack Daniel's" products do not prove the fame of ancillary marks.**

The same problem affects the first and second statutory factors, which look circumstantially to advertising and sales of the marked goods. Advertising or selling "Jack's Daniels" whiskey does not establish the fame of ancillary marks on some bottles.

This is particularly true here because the "Old No. 7" mark does not appear on all Jack Daniel's products. Epps's testimony does not prove advertising amounts, sales revenue figures, or consumer recognition for JDPI's "Old No. 7" whiskey product. Instead, his testimony appears to be for *all* "Jack Daniel's brand" products, some of which do not include "Old No. 7." *See, e.g.*, 2-ER-173 (including Jack Daniel's Tennessee Honey as

a product within the "brand"); 2-ER-243 (similar testimony from licensing manager Tobias Roush).

Although the court noted that JDPI spent hundreds of millions of dollars to promote Jack Daniel's whiskey, the court did not mention—and could not have, because there was no evidentiary support—how many of those advertisements actually featured "Old No. 7." The record indicates that the appearances of "Old No. 7" in the advertisements are either in depictions of the Jack Daniel's bottle as a whole, or as an ornament accompanying the "Jack Daniel's" mark. There is no evidence that Jack Daniel's whiskey advertisements ever featured "Old No. 7" as the primary or prominent mark, apart from "Jack Daniel's."

Evidence of "Jack Daniel's product" sales similarly do nothing to establish the fame of the "Old No. 7" ancillary mark. There is no evidence that advertising, publicity, and sales of "Jack Daniel's" products "had such an impact on the public mind of the 'general consuming public of the United States' that [Old No. 7] deserves the label of 'famous.'" McCarthy, *supra*, § 24:106.

### c. JDPI's registrations of ancillary marks do not prove the marks' fame.

JDPI may have registered "Old No. 7" or the trade dress as a whole, but such registrations cannot prove fame. "One cannot logically infer fame from the fact that a mark is one of the millions on the Federal Register." McCarthy, *supra*, § 24:106; *see* Beebe, *supra*, at 1159 ("[T]he

41

mere fact that a mark is registered cannot logically weigh in favor of a finding that it is famous.").

Indeed, the INTA Presidents who testified as to the draft TDRA in 2004 and 2005 advised against including that factor at all "[b]ecause the mere existence of a registration is really not relevant at all to the question of fame."[4] In light of the inclusion of the factor in the enacted law, McCarthy notes that that the only logical inference that can be properly drawn from registration of a mark would be "*lack* of fame from a *lack* of registration." McCarthy, *supra*, § 24:106 (emphasis added). That JDPI has registered "Old No. 7" or other ancillary marks does not indicate that they are famous within the meaning of the TDRA.

### B. The district court erred as a matter of law and fact in failing to require that a "famous" mark be tarnished by a similar mark.

The district court's conclusion that it did not even need to determine whether "Old No. 7" or any other ancillary marks were themselves famous"hinged on its conclusion that it was enough that VIP's "poop-themed dog chew toy" made a "'*use* of a mark' that is likely to cause

---

[4] *Committee Print to Amend the Federal Trademark Dilution Act: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary*, 108th Cong. 10 (2004) (statement of Jacqueline A. Leimer, President, INTA) ("2004 Hearing"); *Trademark Dilution Revision Act of 2005: Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the H. Comm. on the Judiciary*, 109th Cong. 11 (2005) (statement of Ann Gundelfinger, President, INTA) ("2005 Hearing").

dilution by tarnishment by associating a junior mark with a similar famous mark." 1-ER-35. This was legal error. It is not enough that the defendant use *any* tarnishing mark that might harm a famous mark.

Instead, in addition to protecting only a small class of household names, the TDRA requires proof of a narrow *mechanism* of tarnishment. The TDRA's plain language requires the comparison of the "famous mark" to the "mark or trade name … that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark." 15 U.S.C. § 1125(c)(1). Specifically, the tarnishment provision clarifies that "'dilution by tarnishment' is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Thus, the plaintiff must prove likely reputational harm from "similarity" between the "famous mark" and the tarnishing mark. Indeed, the Supreme Court in this case recognized that, "[a]s the statute describes the idea [of dilution by tarnishment], an 'association arising from the similarity between' two marks—*one of them famous*—may 'harm[ ] the reputation of the famous mark,' and thus make the other mark's owner liable." *Jack Daniel's,* 599 U.S. at 147 (emphasis added).

The narrowness of this mechanism and the burden it imposed on JDPI are apparent from the plain language of the statute, the limited legislative history of this provision, the post-enactment academic commentary, and the limited case law applying the tarnishment cause of

43

action. To begin, "as with any question of statutory interpretation, our analysis begins with the plain language of the statute. It is well established that, when the statutory language is plain, we must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). Here, the statute's language is unambiguous in requiring "similarity" between the "famous" mark and the tarnishing mark. There were countless ways for Congress to have phrased a broader tarnishment statute,[5] e.g., one that proscribed use of any mark that harmed the reputation of a famous mark, without imposing any "similarity" requirement. The district court made no effort to engage with that language.

Following the plain language is particularly important here because "[s]tatutes passed in derogation of the common law, it is everywhere held, should be construed strictly." *Charney v. Thomas*, 372 F.2d 97, 99 (6th Cir. 1967); *see, e.g.*, *Ross v. Jones*, 89 U.S. 576, 591 (1874); *Moore v. Urquhart*, 899 F.3d 1094, 1105 (9th Cir. 2018). A corollary of this principle is that "[r]emedies of a statutory character, where the right to be enforced was unknown at the common law, are to be followed with strictness, both as to the methods to be pursued and the cases to which they are to be applied." *Ross*, 89 U.S. at 591–92.

---

[5] But that is not to say such statute would have been constitutional, as discussed in part II(A) below.

The common law of trademarks and unfair competition required proof of likelihood of confusion as to source, and did not recognize any cause of action for dilution, and a federal cause of action for tarnishment did not exist with certainty before 2006. *See Moseley v. V Secret Catalogue*, 537 U.S. 418, 432 (2003) ("*Moseley I*") (questioning based on statute text whether 1995 statute recognized cause of action for tarnishment). The current dilution cause of action allows injunctive relief "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," 15 U.S.C. § 1125(c)(1), in derogation of the common law, and should be construed strictly according to its terms.

The plain language is buttressed by the limited legislative history and post-enactment commentary. McCarthy, *supra*, § 24:96 (given the "sparse legislative history" of TDRA, looking to "the testimony of … the President of the International Trademark Association" before the House committee, in light of INTA's role as drafter and primary sponsor of legislation). In the 2005 hearing on the TDRA, INTA President Gundelfinger testified that the TDRA "would require the owner of a famous mark to prove a likelihood of association between its mark and the junior mark, arising from the similarity of the marks." 2005 Hearing, *supra* note 4, at 12. She continued, "Under this test, not just any mental association will suffice. It must be an association that arises from the similarity or identity of the two marks, as opposed to an association that

arises because of product similarities or competition between the owners of the two marks, or for some other reason." *Id.*; *see* 2004 Hearing, *supra* note 4, at 11 (similar comment by INTA President Leimer).

Similarly, Professor Beebe, in a leading commentary on the newly enacted TDRA, recognized that, as to blurring and tarnishment, the TDRA "contains important limitations on what kind of 'association' is actionable." Beebe, *supra*, at 1165; *see id.* at 1172 ("This definition of tarnishment may be parsed in the same way that the Act's definition of tarnishment was parsed above."). Among other things, "in requiring that the plaintiff show that 'association' arises from 'the similarity between a mark or trade name and a famous mark,' the Act recognizes that some associations will arise from sources other than the similarity of the parties' marks." *Id.* at 1168. No action will lie "[i]f consumers associate the two marks only because the products to which they are affixed have similar characteristics," because tarnishment requires "that this association arises from the 'similarity' of the parties' marks." *Id.* at 1168, 1172; *see id.* at 1172 (explaining that "a t-shirt or bumper sticker that states 'Wal-Mart is Evil' …, though certainly tarnishing, is not prohibited under the Act"). McCarthy agrees: "The required 'association' must be created solely by the similarity of the conflicting marks, not from some other source." McCarthy, *supra*, § 24:117.

Similarity requires more than creating a mere mental association between the two marks. *Moseley I*, 537 U.S. at 433–44; *Starbucks*, 588

F.3d at 110 (holding that "Charbucks" was not tarnishing). The required association must be driven by the similarity of the famous mark and tarnishing junior mark themselves, not other sources. Thus, this Court affirmed the dismissal of a dilution claim because, assuming the plaintiff's marks were famous, he "cannot plausibly allege that any 'association' will arise from a 'similarity' between the marks." *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 621 (9th Cir. 2017).

Any approach that did not require comparison of the famous mark to the "similar" tarnishing mark would allow the plaintiff to bootstrap from the "famous" mark to protection for any *non-famous* elements that appeared somewhere on the product. Adopting a rule that allows penumbral tarnishment is not only contrary to the statute's plain language, but also would undermine Congress's purpose of protecting only the limited class of famous marks.

Here, the district court erred as a matter of law by rejecting any obligation to compare the famous mark with the allegedly tarnishment mark, citing only the Sixth Circuit's decision on remand in *V Secret Catalogue v. Moseley*, 605 F.3d 382 (6th Cir. 2010) ("*Moseley II*"). But in that case, the heart of the tarnishment lay in the similarity of the plaintiff's famous mark "Victoria's Secret" for lingerie and the defendant's nearly identical mark "Victor's Secret" for a "sex toys" shop. Those two marks were the *only* marks at issue, and the Sixth Circuit recognized extensive precedent establishing "that a famous mark is

47

tarnished when its mark is semantically associated with a new mark that is used to sell sex-related products." *Id.* at 388.



Here, unlike the plaintiff in *Moseley*, JDPI never quarreled with use of the mark similar to its famous mark—"Bad Spaniels." JDPI's executive testified that "Bad Spaniels" did *not* infringe "Jack Daniel's"—it was not the "problem." 2-ER-422–23. Indeed, in conducting his confusion survey, JDPI's survey expert, Gerald Ford, used "Bad Spaniels" as pictured on the "control" dog toy. 2-ER-422–23; 6-ER-1472.

Moreover, "Bad Spaniels" does not refer to defecation—dogs can be "bad" because they bark or chew furniture—and JDPI's tarnishment expert Itamar Simonson never claimed that "Bad Spaniels" was a "disgusting" poo reference or otherwise tarnishing. 2-ER-296 (Simonson's testimony referring to "Old No. 2, defecation, poo by weight"); 2-ER-297 (referring to "poo, or Old No. 2").

The untenable nature of the district court's analysis is emphasized by its reliance on the dog toy's reference to "43% POO BY VOL." That may be a parody of the Jack Daniel's label's reference to "40% ALC. BY VOL. (80 PROOF)," but such a statement of alcohol content cannot be a protectable mark or an element of trade dress because it is a functional statement in a form required by federal regulations governing labels on

distilled spirits, as promulgated under the Federal Alcohol Administration Act, 27 U.S.C. § 205(e)–(f), by the U.S. Department of the Treasury's Alcohol and Tobacco Tax and Trade Bureau. *See* 27 C.F.R. § 5.65(2)(b)(2) (allowing compliance by statement "Alc. 40% by vol" with "degrees of proof"). Such universal and legally mandated functional items are unprotected by federal law. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 484 (1995) (recognizing as to alcohol-content statements that "the general thrust of federal alcohol policy appears to favor greater disclosure of information"); *Pocket Plus, LLC v. Pike Brands, LLC*, 53 F.4th 425, 433 (8th Cir. 2022) (recognizing that "trademark law does not protect individual features of a trade dress that are functional").[6] The district court simply could not base a tarnishment claim in whole or in part on a joke about federal disclosure rules that is not similar to any mark, much less a famous one.

### C. VIP's Bad Spaniels toy did not tarnish JDPI's marks.

Finally, the district court erred in finding that the Bad Spaniels parody dog toy tarnished any famous JDPI mark, i.e., is likely to harm the reputation of the iconic "Jack Daniel's" mark. This Court's reversal of

---

[6] While this Court has recognized that protectable trade dress many include functional and nonfunctional elements that, taken together, are nonfunctional and distinctive, *VIP Prods.,* 953 F.3d at 1173, here JDPI and its expert singled out a particular "disgusting" poo reference that related to a purely functional element required by law on all distilled spirits.

the district court's finding of tarnishment will allow the Court to avoid reaching the question of the tarnishment statute's constitutionality. *E.g.*, *Dent v. Holder*, 627 F.3d 365, 374 (9th Cir. 2010). Whatever "tarnishment" means, it cannot encompass mild, light-hearted jokes about dog poo that, as JDPI's expert admitted, do not suggest that "there's poo in the Jack Daniel's product." 2-ER-297.

Unlike the dilution-by-blurring provision, which provides a multifactor test for determining the likelihood of impairing the distinctiveness of the famous mark, 15 U.S.C. § 1125(c)(2)(B)(i)–(vi), the dilution-by-tarnishment section is vague and content-based: the statute says only that the mark must be likely to "harm the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C).

As the district court correctly identified, mere association of a famous mark with a negative-sounding junior mark is insufficient to prove tarnishment. 1-ER-38. "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996); *see also Moseley II*, 605 F.3d at 388 (citing "at least eight federal cases in six jurisdictions" finding tarnishment from use of mark "to sell sex-related products"). Tarnishment generally occurs only with the affiliation of a famous mark to sex, drugs, or illegal activities. *Moseley II*, 605 F.3d at 388 (describing a presumption of tarnishment for sex-related uses). Although cases have held tarnishment

to apply beyond those "seamy" uses, they are generally limited to those instances where the junior mark is used by a direct competitor: whether the defendant's mark is in "direct competition" is "an important, even if not determinative, factor." *Hormel*, 73 F.3d at 507.

In the *Hormel* case, the Second Circuit held that the Muppets Treasure Island licensed merchandise for the "Spa'am" character (a somewhat unflattering reminder that Spam canned lunch meat comes from real pigs) was not tarnishing. The court advised a "cautious approach," lest the tarnishment provision "prohibit all uses of a distinctive mark that the owner prefers not be made." *Id.* at 508. This was particularly important because of the parody element: "Henson does not seek to ridicule SPAM in order to sell more of its competitive products; rather, the parody is part of the product itself." *Id.*

To that end, courts should not "assume a purportedly negative-sounding junior mark will likely harm the reputation of the famous mark by mere association when the survey conducted by the party claiming dilution could have easily enlightened us on the matter." *Starbucks*, 588 F.3d at 110. Absent such survey evidence—JDPI offered no survey evidence of any kind—the courts are left to weigh tarnishment in a purely speculative way under a particularly vague statutory standard. For example, the Second Circuit asked whether "Charbucks" hurt the "Starbucks" brand, or whether it "strengthen[ed] the positive impressions of Starbucks because it brings to the attention of consumers

that the 'Char' is absent in 'Star'bucks, and, therefore, of the two 'bucks,' Starbucks is the 'un-charred' and more appealing product." *Id.* The Court should not need to guess.

There is no evidence that any person ever associated Bad Spaniels with Jack Daniel's in a negative light, much less that it caused some type of harm to the reputation of JDPI's mark. No consumers ever told JDPI or VIP that they thought the Bad Spaniels toy was disgusting or hurting Jack Daniel's mark, nor was there survey evidence to that effect. 2-ER-405–06; 3-ER-519. The Bad Spaniels toy has been on the market for ten years and, even after publicity from the Supreme Court case, JDPI has not sought to introduce evidence of actual reputational harm to its mark.

As a poor proxy for actual tarnishment, the district court relied entirely on the subjective impression of Itamar Simonson, a marketing professor, who opined that the Bad Spaniels toy is tarnishing because "if you associate any food or beverage with defecation, you are creating disgust with respect to that food or beverage that is being now associated with defecation." 2-ER-296–97; 2-ER-305. Claiming to speak on behalf of all "normal people," he invoked "principles of consumer psychology" to reach a "*common sense conclusion*" that poop "is not something that you would like to associate … anything you eat or drink with." 2-ER-288; 2-ER-295; 2-ER-300; 2-ER-321 (emphasis added).

Dr. Simonson claimed that the Bad Spaniels toy "will generate the disgust" even though "[c]onsumers are not stupid. *No one* would think

that there's poo in the Jack Daniel's product …." 2-ER-297 (emphasis added). He conducted no surveys or focus groups to verify his conclusion. 2-ER-305. Nor is there any indication that he accounted for the facts that (1) Bad Spaniels is a parody dog toy or (2) certain kinds of "poo" are considered wholesome aspects of ordinary life and routinely featured in family movies, *e.g.,* baby poo and dog poo. In short, not all feces are created equal—or greeted by people in the same way. *See Hormel*, 73 F.3d at 507 ("The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use."). That is even truer for the mildest poo euphemisms on a parody dog toy.[7] The TDRA cannot reasonably be read as creating a per se embargo of poo jokes in the vicinity of food and beverage marks.

Moreover, Dr. Simonson's testimony depends entirely on his own subjective opinion—as someone who has never owned a dog. 2-ER-311. Neither his report nor any of the materials on the "Associative Network Model" he invoked were introduced into evidence, and there is no support for the proposed syllogism that "all excrement is disgusting, dog poo is

---

[7] The parodic nature of the use remains as relevant a factor in evaluating likelihood of tarnishment as it was in evaluating likelihood of confusion, even if JDPI cannot avail itself of the safe harbor presented by the TDRA's "fair use" exclusion. 15 U.S.C. § 1125(c)(3)(A). While the Supreme held that the TDRA exclusions were not applicable because "Bad Spaniels" mark and trade dress were "a designation of source," 599 U.S. at 159–60, the Supreme Court never held that parody was irrelevant under the general test for tarnishment.

excrement, therefore dog poo is disgusting." If that proposition were true, then civet coffee would not be a highly prized beverage of "connoisseurs in the United States, Europe, and East Asia": the "beans are found in the droppings" of the civet cat, which "excretes the hard, indigestible innards of the fruit … after they have been fermented in the animal's stomach acids and enzymes to produce a brew described as smooth, chocolaty, and devoid of any bitter aftertaste." Norimitsu Onishi, *From Dung to Coffee Brew with No Aftertaste*, N.Y. Times, Apr. 17, 2010. *See* Dist. Dkt. 368 at 13. In short, when it comes to animal poo, context is everything. And the record shows that "dog poo" is a regular topic of songs intended for educating young children. Dist. Dkt. 357 at 38.

Dr. Simonson's testimony is particularly insufficient because his "common sense" conclusion was controverted by that of VIP's expert, Bruce Silverman, a leading advertising executive and consultant who actually conducted four focus groups that produced unanimous results that square with common sense and reasonable expectations: "they thought it was funny," and "they thought that [the idea the toy created disgust] was ludicrous." 3-ER-672. "Nobody was disgusted … or suggested that anyone would be disgusted by the toy or disgusted by Jack Daniel's because of the toy." Dist. Dkt. 129-1 at 17 (cleaned up).[8]

---

[8] The district court's primary criticism of Silverman's methodology was that he informed the focus groups explicitly of the obvious—that the Bad Spaniels dog toy was a "spoof product." 1-ER-17.

McCarthy reflects that such harmless, light-hearted ribbing cannot support a claim for dilution. "The general rule permits anyone, competitor, critic or comedian, to use a famous mark to make fun of or to criticize the products or policies of the mark owner" under both the First Amendment and the TDRA. McCarthy, *supra*, § 24:90. Where a party uses something that looks like a mark "to comment on, criticize, ridicule, parody, or disparage the other or the other's goods, services, business, or mark," tarnishment cannot arise as a matter of law, and the aggrieved party can recover only under the torts of "defamation, invasion of privacy, or injurious falsehood." Restatement (Third) of Unfair Competition § 25 (1995). JDPI owns a valuable mark—it does *not* own the right to be free of commentary or mockery.

Finally, to support its conclusion that relatively benign jokes can support a tarnishment claim, the district court cited four cases involving (i) state-law dilution claims (and one nondilution claim) that long antedated the TDRA; (ii) nearly identical and allegedly confusing word marks (e.g., DOGIVA), (iii) actual *nonparody* products referenced by the marks (e.g., dog biscuits, insecticidal floor wax, beer-stein handles), and (iv) one parody product (chewing gum) dismissed as such because it was sold for profit. Those cases are of no moment.

55

## II. The district court erred by not striking down JDPI's tarnishment claim on constitutional grounds.

If the Court concludes that JDPI has proved the elements of a tarnishment claim, the Court should strike down the TDRA's tarnishment provision on the ground that it constitutes viewpoint discrimination in violation of the First Amendment. The district court initially rejected VIP's First Amendment arguments on the mistaken theory that VIP's "dog toy is not entitled to protection under the First Amendment because it is not an expressive work" and "trademark law" applies. 1-ER-98–99. On the last remand, the district court declined to consider VIP's First Amendment challenge based on Supreme Court trademark decisions rendered during the pendency of this case because VIP had not included the First Amendment challenge as an affirmative defense in its pleading. 1-ER-29; 1-ER-33. Both the merits and waiver holdings were incorrect.

### A. The tarnishment cause of action constitutes unconstitutional viewpoint discrimination.

The Lanham Act's tarnishment provision violates the First Amendment for the same reason that the Supreme Court struck down two other Lanham Act provisions while this case has been pending: it amounts to unconstitutional viewpoint discrimination. *See Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019) (majority opinion striking down registration bar for "scandalous" or "immoral" marks); *Matal v. Tam*, 582 U.S. 218, 223 (2017) (plurality opinions striking down registration bar

for "derogatory" marks). As the *Tam* plurality emphasized, "[g]iving offense is a viewpoint," *Tam*, 582 U.S. at 243, and "happy-talk clause[s]" that stifle that viewpoint cannot withstand constitutional scrutiny. *Id.* at 246 (op. of Alito, J.). The *Brunetti* Court's majority opinion—issued when this case was already on appeal—further explained that a registration bar that "allows registration of marks when their messages accord with, but not when their messages defy, society's sense of decency or propriety" is unquestionably "viewpoint-based." *Brunetti*, 588 U.S. at 394. While *Tam* and *Brunetti* invalidated bars on registration due to a mark's content even though the applicant could continue using the mark, the tarnishment provision amounts to an even more serious constitutional violation because, in light of the injunctive relief, "speech is being restricted." *Brunetti*, 588 U.S. at 401 (Roberts, C.J., concurring).

The dilution-by-tarnishment provision is viewpoint-based: marks that tarnish can be banned, but marks that burnish cannot. "Dilution by tarnishment" is defined by the Lanham Act as "association … that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). The statute bars tarnishment "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." *Id.* It is, to use Justice Alito's phrase, the ultimate "happy-talk clause." *Tam*, 582 U.S. at 246 (op. of Alito, J.). Trademark owners seek to enjoin allegedly tarnishing uses because they don't like what is being said, but "the public expression of ideas may not be prohibited merely because the ideas are

57

themselves offensive to some of their hearers." *Tam*, 582 U.S. at 244 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)). Regardless of whether the Court applies strict or scrutiny or some lesser standard, the tarnishment statute cannot pass constitutional muster.

### 1. Tarnishment cannot satisfy strict scrutiny.

Because the tarnishment statute discriminates based on viewpoint, it is necessarily subject to strict scrutiny. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The Supreme Court has long cautioned that the First Amendment prevents the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). The Court has rejected as "startling and dangerous" any free-floating First Amendment test in the context of content- and viewpoint-based regulations on speech. *Id.* at 717 (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)). Where the government seeks to regulate speech "because of its message," such a regulation is "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. And where the target of the regulation is certain messages, "the violation of the First Amendment is all the more blatant," because "[v]iewpoint discrimination is … an egregious form of content discrimination." *Id.* at 829.

To pass constitutional muster, a viewpoint-based regulation must advance a compelling state interest and be narrowly tailored to meet that end. *See Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) (explaining that "laws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message the speech conveys'" must pass strict scrutiny) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (cleaned up)); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 532 (2022); *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022). The party seeking to enforce the regulation bears the burden of showing both the substantial interest and that the means selected is the least restrictive means of achieving the governmental interest. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992).

It is difficult to identify precisely what Congress's legitimate goal could be for the tarnishment provision as currently written. Unlike traditional infringement law, which has its origins in the common-law goal of consumer protection, dilution is a creature of statute. *Moseley I*, 537 U.S. at 429. Because tarnishment is not rooted in the common law, it has none of the protections that have developed for common-law causes of action, like trade defamation's requirement of falsity and scienter, that permit it to withstand scrutiny under the First Amendment. *See, e.g.*,

*Laserworks v. Pitney Bowes, Inc.*, 105 F. App'x 657, 661 (6th Cir. 2004) (listing elements of trade defamation).

Because the tarnishment provision does not require confusion, injury, damages, or even falsity, the only explicable governmental interest in prohibiting junior marks that tarnish is to stop speech that the government (at the behest of the trademark owner) does not like, or to stop criticism of speech it does like. That the government wants to protect famous brands from mean words cannot satisfy the high bar of strict scrutiny. *See Tam*, 582 U.S. at 246.

Nor does protecting a company's investment in famous marks justify stifling the speech of others. The Supreme Court has repeatedly rejected regulations that stifle the speech of one party to protect the free expression of another—the government may not "beggar thy neighbor" to protect preferred viewpoints. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011). Short of proof of actual confusion, the tarnishment cause of action acts only to burden nonconfusing speech to the benefit of the senior, and ostensibly preferred, trademark holder. Even purely and demonstrably false speech about a mark is entitled to First Amendment protection. *Alvarez*, 567 U.S. at 717–19 (striking down Stolen Valor Act even though it "targets falsity and nothing more"). As this case illustrates, the tarnishment statute does not even require falsity: Dr. Simonson admitted that no one would interpret mild poo jokes

about "Bad Spaniels" as suggesting that "there's poo in the Jack Daniel's product." Dist. Dkt. 234 at 172.

Moreover, the tarnishment statute as written is not narrowly tailored and cannot be the least-restrictive means of accomplishing Congress's aims. The 1995 predecessor statute to the TDRA was narrower in that "unambiguously require[d] a showing of actual dilution, rather than a likelihood of dilution." *Moseley I*, 537 U.S. at 433. Here, JDPI never even tried to show actual dilution. But following *Moseley*, Congress enacted the TDRA because it perceived any such requirement to be an "undue burden" on trademark holders. *Moseley II*, 605 F.3d at 387 (quoting legislative history). The TDRA's removal of any actual-harm requirement made the constitutional defect even more striking because tarnishing designations of source may be enjoined, and "no parody, criticism, or commentary will rescue the alleged dilutor. It will be subject to liability regardless." *Jack Daniel's*, 599 U.S. at 162.

The Supreme Court in *Tam* and *Brunetti* provided the precedential basis for striking down Lanham Act provisions on grounds of unconstitutional viewpoint discrimination. Since then, commentators have identified the tarnishment provision as the next Lanham Act provision in the crosshairs of constitutional scrutiny and predicted that it will not survive. *See, e.g.*, John Gilbertson, *Blunt Advice: A Crash Course in Cannabis Trademarks*, 60 IDEA: L. Rev. of Franklin Pierce Ctr. for Intell. Prop. 502, 532 (2020) ("'tarnishment' is likely broad

enough to encompass marks which 'shock the sense of decency,' placing it in *Brunetti*'s crosshairs"); Lisa P. Ramsey, *Free Speech Challenges*, 56 Hous. L. Rev. 401, 456 (2018) ("After *Tam*, dilution laws are probably unconstitutional."); Theodore H. Davis, Jr., *Introduction: United States Annual Review, The Seventieth Year of Administration of the Lanham Act of 1946*, 108 Trademark Rep. 1, 3 n.22 (2018) (explaining that courts' application of dilution by tarnishment "appears as much a viewpoint-discriminatory measure as the statutory prohibition at issue in *Tam*"); Zahraa Hadi, *If Disparagement is Dead, Dilution Must Die Too*, 33 Berkeley Tech. L. J. 1189, 1220 (2018) ("When subjected to the type of First Amendment analysis the Supreme Court applied in *Tam*, the TDRA should fail.").

### 2. Tarnishment cannot pass a commercial speech test.

The tarnishment provision would not even survive under the less-rigorous standard of intermediate scrutiny applied to regulations of commercial speech. Under the *Central Hudson* test, a regulation that limits commercial speech that is neither misleading nor related to unlawful activity is constitutional only if it directly advances a substantial governmental interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980); *see also Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183 (1999).

There is no evidence, nor has there been any argument, that VIP's speech is misleading. Indeed, the district court ultimately concluded that

it is not even likely to cause confusion. As explained above, the government has no legitimate interest in stopping speech that criticizes, embarrasses, or mocks famous marks on the ground that it harms their reputation. But, even if it did, the TDRA's tarnishment provision does not even distinguish between *actually* diluting speech and speech that merely offends or mocks, and therefore censors speech well outside the ambit of the government's already suspect interest. *See Cent. Hudson*, 447 U.S. at 570 (striking down regulation that targeted all promotional advertising even if unrelated to government's substantial interest). The TDRA's laxer standard for injunctive relief against nonmisleading expression cannot survive any form of constitutional scrutiny.

## B. The district court erred in holding that VIP waived its constitutional argument.

The district court declined to consider VIP's challenge to the constitutionality of the TDRA's tarnishment provision, agreeing with JDPI that VIP had waived the argument. While the district court agreed with "little difficulty" that considering VIP's constitutional challenge "would not be inconsistent with the Ninth Circuit's mandate," it ultimately found waiver "because VIP's challenge is not raised in the pleadings." 1-ER-29; 1-ER-33. That conclusion was error. Neither JDPI nor the district court cited any Ninth Circuit precedent requiring that any and all affirmative defenses be raised in the answer or other pleading.

Instead, this Court has taken a more liberal approach to raising affirmative defenses. It has repeatedly held that a party may raise an affirmative defense outside of its answer or other pleading so long as the new defense does not prejudice the plaintiff or require additional factual development. *See, e.g.*, *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) ("Ordinarily affirmative defenses may not be raised by motion to dismiss, but this is not true when, as here, the defense raises no disputed issues of fact.") (internally citing Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1277); *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984) (holding that, "absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion"); *Livingston Sch. Dist. Nos. 4 & 1 v. Keenan*, 82 F.3d 912, 917 n.5 (9th Cir. 1996) (motion to dismiss); *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (motion for judgment on the pleadings); *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993) (motion for summary judgment). "This is especially true as to those affirmative defenses that seem likely to dispose of the entire case or a significant portion of the case and defenses that require no factual inquiry for their adjudication." Wright & Miller, *supra*, § 1277 (4th ed. 2025).

Wright and Miller continue, "In situations such as these, the federal courts appear to be wise in overlooking the formal distinctions between affirmative defenses and motions, which have their primary justification in history rather than logic." *Id.* This Court has likewise commented that

the formal "requirement was commonly imposed in prior equity practice" but that "[o]ur circuit liberalized the requirement that affirmative defenses be raised in a defendant's initial pleading." *Rivera*, 726 F.2d at 566.

This more-liberal approach mirrors the circumstances where this Court will consider issues for the first time on appeal. First, this Court "may hear an issue raised for the first time on appeal so long as 'the issue presented is a pure question of law and the opposing party will suffer no prejudice as the result of the failure to raise the issue in the trial court,' conditions which here obtain." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1069 n.4 (9th Cir. 2010) (considering newly raised issue) (quoting *Raich v. Gonzales*, 500 F.3d 850, 868 (9th Cir. 2007)); *see Bank of Am., N.A. v. Twilight Homeowners Ass'n*, 2022 WL 822116, at *1 (9th Cir. Mar. 17, 2022) (same; considering new argument because appellee "can point to no prejudice caused by [appellant's] failure to raise that exact argument before the district court").

Whether the TDRA's tarnishment cause of action constitutes unconstitutional viewpoint discrimination is an issue that "is purely one of law, does not affect or rely upon the factual record developed by the parties, and will not prejudice the party against whom it is raised." *Dream Palace v. County of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004) (quotation omitted) (considering issue not raised below). Neither JDPI

nor the district court cited any factual development that would be required. The question requires only analysis of statutory language.

Moreover, neither JDPI nor the district court identified any conceivable prejudice to JDPI created by the constitutional argument. VIP raised the constitutional issue in its briefing to the Supreme Court, Br. of Respondent 52–55, and it again indicated its intention to raise the issue in its supplemental brief to this Court on remand. No. 21-16969, Dkt. 38 at 19–24. On this Court's general remand to the district court, VIP filed a notice of constitutional question under Federal Rule of Civil Procedure 5.1, Dist. Dkt. 340, and after briefing on that issue the district court certified the question to the U.S. Attorney General, Dist. Dkt. 354. In addition to the parties' three rounds of briefing, the United States intervened and filed a brief addressing the constitutional challenge. Dist. Dkt. 361, 364. JDPI has had notice of the issue and "a full opportunity to brief its response to the new arguments." *Dream Palace*, 384 F.3d at 1005.

Second, this Court may consider an issue raised for the first time on appeal where "the new issue arises while the appeal is pending because of a change in the law." *Raich*, 500 F.3d at 868. This includes situations where, as the resulting of an intervening "Supreme Court decision after the proceedings in the district court were complete," there is now "a very different legal landscape." *Dream Palace*, 384 F.3d at 1005 (considering new issue). In this case, facial challenges to the Lanham Act

on grounds of viewpoint discrimination became viable after the Supreme Court's split nonmajority opinions in *Tam* and then the Supreme Court's majority opinion in *Brunetti*. *Tam* was not handed down until after the district court ruled on summary judgment; *Brunetti* was not handed down until after the completion of briefing before this Court in the first appeal. Both of these cases were issued long after the close of the pleadings. Waiver requires "the intentional relinquishment or abandonment of a known right," *Wood v. Milyard*, 566 U.S. 463, 474 (2012) (cleaned up), and VIP could not possibly waive an argument premised on cases that had not yet been decided.

If this Court is capable of considering the issue for the first time on appeal, it was error for the district court, proceeding on a general mandate that it admitted allow consideration of the constitutional challenge, to declare that it had been conclusively waived during the pleadings phase ten years ago.

Instead of analyzing this issue in accordance with Ninth Circuit precedent, the district court engaged in an overly simplistic application of Federal Rule of Civil Procedure 8. The district court cited only Rule 8 and this Court's statement in *Metcalf v. Golden (In re Adbox, Inc.)*, 488 F.3d 836 (9th Cir. 2007), that Rule 8(a) and (c) "provide that a defendant's failure to raise an affirmative defense in his answer effects a waiver of that defense." 1-ER-33. But those authorities stand only for the unremarkable proposition that, at the beginning of a case, affirmative

67

defenses should generally be raised in an answer. This Court has never recognized that as an iron-clad rule preventing a party from raising legal arguments later in the pendency of the case. Given the district court's post-remand comment that VIP could not "move, at this point, to amend your complaint," Dist. Dkt. 382 at 11, the court's reliance on an incurable formality in the face of intervening High Court authority was, in short, unjust.

VIP's constitutional challenge was raised years ago, and the parties and the United States have fully briefed it. The public interest in the free flow of ideas militates in favor of the Court's consideration of the purely legal issues raised by VIP's challenge. The district court's erroneous waiver argument should not stand.

## CONCLUSION

The Court should reverse the district court's judgment for JDPI as to tarnishment, vacate the permanent injunction, and remand with instructions to enter judgment for VIP.

DATED this 28th day of July, 2025.

DICKINSON WRIGHT PLLC

s/ Bennett Evan Cooper
Bennett Evan Cooper
David G. Bray
Vail C. Cloar
Alexandra Crandall
1850 N. Central Avenue, Suite 1850
Phoenix, Arizona 85004

Attorneys for VIP Products LLC

### STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, VIP states that that there are no related cases pending before this Court.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because it contains 13,775 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook.

DATED this 28th day of July, 2025.

s/ Bennett Evan Cooper