# No. 25-2027

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

VIP PRODUCTS LLC,
*Plaintiff/Counterdefendant-Appellant,*
v.
JACK DANIEL'S PROPERTIES, INC.,
*Defendant/Counterclaimant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:14-cv-02057-SMM
Hon. Stephen M. McNamee, Presiding

## BRIEF OF AMICI LAW PROFESSORS

Dated: August 04, 2025

Rebecca Tushnet
rtushnet@law.harvard.edu
520 Hauser, Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: 703-593-6759

Attorney for Amici Curiae IP Law Professors

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae Law Professors each state that they are individuals.

Dated: Aug. 4, 2025 By: /s/ Rebecca Tushnet

Rebecca Tushnet
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
rtushnet@law.harvard.edu
Counsel for Amici Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF INTEREST OF AMICI CURIAE ................................................. 1

SUMMARY OF ARGUMENT ............................................................................... 1

ARGUMENT ........................................................................................................ 6

    I.    Tarnishment Is Viewpoint-Based .............................................................. 8

    II.   Even if Tarnishment Weren't Viewpoint-Based, It Would Be Content-Based and Fail Both Strict and Intermediate Scrutiny ................................................. 12

    A. Tarnishment Lacks a Historical Foundation for Its Speech-Suppressive Effects ............... 14

    B.    Commercial Use Is Not Relevant to the First Amendment Inquiry ............................. 16

    C.    Protecting Reputation Against Nondefamatory Criticism Is Not a Legitimate Government Interest ............................................................... 19

    E.    Repackaging The Government's Interest Under Other Labels Fails ............................ 28

CONCLUSION .................................................................................................... 30

Appendix* ......................................................................................................... 31

CERTIFICATE OF COMPLIANCE ....................................................................... 32

CERTIFICATE OF SERVICE ............................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997) ..........................................18

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191 (8th Cir. 1994) ..........................................................24

*Borden Ice Cream Co. v. Borden's Condensed Milk Co.,* 201 F. 510 (7th Cir. 1912) ......................................................................................................................15

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ........................3, 26

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..............................................................11

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th Cir. 1996) ..........................................................................................18

*City of Austin v. Reagan National Advertising, LLC*, 596 U. S. 61 (2022) ............13

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ......................18

*Cohen v. California*, 403 U.S. 15 (1971) ..............................................................6

*Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d 520, 530 (6th Cir. 2007) ........................................................................................................24

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505 (4th Cir. 1999)) ...........24

*Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.*, 952 F.2d 1059 (9th Cir. 1990). 18

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ................................................23

*Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497 (2d Cir. 1996) ........................................................................................................8

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ................................................................5

In *Matal v. Tam*, 582 U.S. 218 (2017) ..............................................................5

*Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023) ..............1

*Janus v. American Federation of State, County, & Mun. Employees*, 585 U.S. 878 (2018) ........................................................................................................29

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007) ..........................................................................................................8

*Marbury v. Madison*, 5 U.S. 137 (1803) ..............................................................6

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ........................17

*New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992) ......7

*New York Stock Exchange, Inc. v. Gahary*, 196 F.Supp.2d 401 (S.D.N.Y. 2002) .. 23

*Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023) ................................................20

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ...................................................4

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ....................................3,12

*Smith v. California*, 361 U.S. 147 (1959) ...............................................18

*Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union*, 585 F. Supp. 2d 815 (E.D. Va. 2008) ...........................................................23

*Starbucks Corp. v. Wolfe's Borough Coffee Inc.*, 588 F.3d 97 (2d Cir. 2009).........8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .....................27

*U.S. v. United Foods, Inc.*, 533 U.S. 405 (2001) ......................................17

*United States v. Alvarez*, 567 U.S. 709 (2012) ........................................25

*United States v. Mongol Nation*, 370 F. Supp. 3d 1090 (C.D. Cal. 2019) ............27

*United States v. Stevens*, 559 U.S. 460 (2010) .....................................3,16

*V Secret Catalogue, V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382 (6th Cir. 2010) ...........................................................................................21

*Vidal v. Elster*, 602 U.S. 286 (2024)........................................... 13, 15

*VIP Products LLC v. Jack Daniel's Properties Inc., 2025 WL 275909 (D. Ariz. Jan. 23, 2025) (JDI II)*................................ .....................1, 2, 11, 27

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20 (2d Cir. 2018) ............................9,11

## Statutory Authorities

15 U.S.C. § 1125(c)(1)....................................................... 14, 20

15 U.S.C. § 1125(c)(2)(C) ................................................ 3, 8, 11

15 U.S.C. § 1125(c)(3)(C) ........................................................17

15 U.S.C. §1052(a) .................................................................5

## Other Authorities

Bradford Laura R., Emotion, Dilution, and the Trademark Consumer, 23 Berkeley Tech. L.J. 1227, 1237 (2008) ..............................................................24

Buccafusco, Christopher et al., Testing Tarnishment in Trademark and Copyright Law: The Effect of Pornographic Versions of Protected Marks and Works, 94 Wash. U. L. Rev. 341 (2016).................................................. 25

Burstein Sarah L., Dilution by Tarnishment: The New Cause of Action, 98 Trademark Rep. 1189, 1192 (2008) .....................................................15

Dogan Stacey L. & Mark A. Lemley, Parody as Brand, 47 U.C. Davis L. Rev. 473, 486 (2013)..............................................................................27

iv

Handler Michael, What Can Harm the Reputation of a Trademark? A Critical Re-evaluation of Dilution by Tarnishment, 106 Trademark Rptr. 639, 672–675 (2016)....................................................................................................21

Heymann Laura A., Metabranding and Intermediation: A Response to Professor Fleischer, 12 Harv. Negot. L. Rev. 201, 218–19 (2007).....................................14

Lemley Mark A. & Eugene Volokh, Freedom of Speech and Injunctions in Intellectual Property Cases, 48 Duke L.J. 147, 221 n. 325 (1998) .............. 19, 27

Linford Jake, Justin Sevier, & Allyson Willis, Trademark Tarnishmyths, 55 Ariz. St. L.J. 609, 618 (2023) .....................................................................................25

McCarthy Thomas, McCarthy on Trademarks § 24:67 (5th ed. 2021) ..................13

McKenna Mark P., Dilution and Free Speech in the U.S., Reprise, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3352090, at 13 (2019) .....10

Morrin Maureen & Jacob Jacoby, *Trademark Dilution: Empirical Measures for an Elusive Concept*, 19 J. Pub. Pol'y & Marketing 265, 274 (2000).......................24

Ramsey Lisa P., Free Speech Challenges to Trademark Law After Matal v. Tam, 56 Hous. L. Rev. 401, 429 (2018) ....................................................................19

Rothman Jennifer E., Commercial Speech, Commercial Use, and the Intellectual Property Quagmire, 101 Va. L. Rev. 1929 (2015)................................................17

Tushnet Rebecca, Gone in 60 Milliseconds: Trademark Law and Cognitive Science, 86 Tex. L. Rev. 507, 526-46 (2008) ................................................ 10, 31

Volokh Eugene & Brett McDonnell, Freedom of Speech and Independent Judgment Review in Copyright Cases, 107 Yale L.J. 2431, 2445-46 (1998)......28

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici, listed in the Appendix, are law professors who teach and have written extensively about the First Amendment and intellectual property law. Our sole interest in this case is in the orderly development of trademark law in a way that serves the public interest.[1]

## SUMMARY OF ARGUMENT

Previously in this case, the Supreme Court clarified that, when a parodist uses a parody to indicate the source of its own product, the ordinary likelihood of confusion test provides all necessary protection for the parodist's First Amendment interests against trademark *infringement* claims. *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140, 159 (2023) (*JDI I*). This is because confusion about the source of goods or services is the prime evil against which trademark law is directed. *Id.* at 147 ("Confusion as to source is the bête noire of trademark law— the thing that stands directly opposed to the law's twin goals of facilitating

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), amici certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person other than the amici contributed money that was intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief. F.R.A.P. 29(a).

1

consumers' choice and protecting producers' good will."). The district court has now found that, because the parody was clear, confusion was unlikely.

In the absence of likely source confusion, parodists have First Amendment rights to mock their targets. Nonetheless, the district court below enjoined Appellant VIP's nonconfusing use because it found that VIP's use "tarnished" Appellee JDI's mark. *VIP Products LLC v. Jack Daniel's Properties Inc.*, 2025 WL 275909, at *16-19. (D. Ariz. Jan. 23, 2025) (*JDI II*). But precisely because VIP's parody dog toy is entitled at a minimum to the protection given truthful, nonmisleading commercial speech, the dilution-by-tarnishment claim cannot go without constitutional scrutiny. And regardless of the level of scrutiny applied, the First Amendment condemns viewpoint-based regulations such as tarnishment.

Although the doctrinal landscape has changed since this case began, Appellant VIP has consistently maintained that dilution law cannot constitutionally be applied to bar its nonconfusing parody. This Court should not dodge the constitutional question here.[2]

In general, speakers do not need good reasons to be allowed to speak. In the absence of material deception, the government requires another compelling interest

---

[2] This appeal addresses only dilution by tarnishment, not dilution by blurring, which is not presently at issue.

2

to stop them. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 799 (2011); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). Dilution by tarnishment, defined as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark," 15 U.S.C. § 1125(c)(2)(C), is viewpoint- and content-based protection for famous trademarks that is unrelated to protecting against deception. It protects the powerful at the expense of the less powerful who mock them, serving no substantial government interest, unlike the interest in protecting against consumer confusion that is at the heart of trademark law.

At its core, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Tarnishment fundamentally contradicts that principle, suppressing truthful, nonmisleading speech about famous trademarks—that is, only about trademarks that already have power to shape public discourse.

The Supreme Court has "emphatically rejected [the] 'startling and dangerous' proposition" that the government "could create new categories of unprotected speech by applying a 'simple balancing test' that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test." *Brown*, 564 U.S. at 792 (quoting *Stevens*,

3

559 U.S. at 470). Tarnishment does just that: It singles out a subset of nondeceptive speech and declares such speech impermissible because it might lessen the persuasive value of others' speech.

Appellee JDI argues that tarnishment allows it to prevent consumers from forming new associations with or opinions about it even in the absence of confusion. But, although Congress can permissibly regulate use of trademarks, the First Amendment constrains Congress's ability to restrict truthful, non-misleading speech—even commercial speech—that changes or might change public opinion about another entity in an unfavorable direction.[3]

As the Supreme Court explained:

[A] State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) is in its view greater there. But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion.

*R.A.V. v. St. Paul*, 505 U.S. 377, 388-89 (1992) (citations omitted).

---

[3] Like defamation, dilution is subject to the constraints of the First Amendment because Congress has authorized one party to suppress another's speech, a power it would lack without state support. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("It matters not that that law has been applied in a civil action …. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.") (citations omitted).

Tarnishment claims provide exactly this sort of anti-"demeaning" protection for famous marks.[4]  This is not just content-based suppression of speech, it is viewpoint-based suppression of speech—the prime evil against which the First Amendment protects.

In *Matal v. Tam*,  582 U.S. 218 (2017), the Supreme Court unanimously held that the Lanham Act's prohibition on registering disparaging trademarks, 15 U.S.C. §1052(a), constituted unconstitutional viewpoint discrimination, regardless of whether the expressive dimensions of trademarks are considered commercial or noncommercial speech. *Iancu v. Brunetti*, 588 U.S. 388 (2019), reached the same conclusion with respect to other viewpoint-based prohibitions on registration.

Like the provisions struck down in *Tam* and *Brunetti*, tarnishment creates a viewpoint- and content-based rule that applies to truthful, non-misleading speech. Even worse, whereas the disparagement bar insulated everyone from criticism, whether powerful or powerless, tarnishment protects only the famous, suppressing the speech of the comparatively powerless. And the tarnishment provision is a much more significant restraint of speech: the registration bars at issue in *Tam* and *Brunetti* merely denied a trademark claimant the benefits of federal registration, whereas the tarnishment provision enables a mark owner to fully enjoin speech. All

---

[4] Indeed, "demeaning" means harmful to reputation. See, e.g., https://www.merriam-webster.com/dictionary/demeaning.

this occurs without even requiring a showing of actual harm to the trademark owner. *JDI II*, 2025 WL 275909, at *18 (noting that "actual tarnishment is not required" under the statute).

Even if tarnishment's viewpoint-based nature can be ignored, its content-based nature cannot be. Lacking a basis in history at the Founding or even when the Reconstruction amendments were adopted, it fails even intermediate scrutiny.

## ARGUMENT

It has long been settled that Congress cannot pass laws that override the Constitution, *Marbury v. Madison*, 5 U.S. 137 (1803), and the Lanham Act is no exception. *Tam*, 582 U.S. at 239, 247 (noting that the expressive dimensions of trademarks warrant First Amendment protection; striking down a prohibition on registering "disparaging" marks); *Brunetti*, 588 U.S. at 398-99 (same for "scandalous" and "immoral" marks). Under the First Amendment, JDI's remedy for nondefamatory challenges to its reputation is in the marketplace of ideas, not in injunctions and damages.

Creators, parodists or otherwise, routinely make nondefamatory portrayals of beloved (or disliked) people, institutions, and other things they see in the world or find in its history. For this reason, the First Amendment protects not only speakers' choices of topics, but also their choices of how to speak about those topics. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 26 (1971) ("[W]e cannot

6

indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process."); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992) ("[W]e need not belabor the point that some words, phrases or symbols better convey their intended meanings than others.").

The Supreme Court did not address the constitutionality of tarnishment in its opinion in this case, only a statutory interpretation issue. *JDI I*, 599 U.S. at 162. But the Court did focus repeatedly on the core function of trademark law: "the Lanham Act views marks as source identifiers—as things that function to 'indicate the source' of goods, and so to 'distinguish' them from ones 'manufactured or sold by others.' The cardinal sin under the law … is to undermine that function." *Id.* at 156-57 (cleaned up); *see also id.* at 161 (noting that ridicule of trademark is unlikely to interfere with source identification). Tarnishment does not protect source identification, but rather brand reputation; that focus strengthens the constitutional case against it. *Cf. Tam*, 582 U.S at 247 (Alito, J., opinion of four Justices) (noting dangerous lack of connection between viewpoint-based restrictions and commercial goals of trademark law).

## I.      Tarnishment Is Viewpoint-Based

Tarnishment claims single out a subset of uses of a famous mark based on the views expressed by those uses. Use of a mark tarnishes only when it "harms the reputation of the famous mark." 15 U.S.C. 1125(c)(2)(C). Meanwhile, nonconfusing, source-indicating uses that aren't negative towards a trademark are not subject to suppression. *See Starbucks Corp. v. Wolfe's Borough Coffee Inc.*, 588 F.3d 97, 111 (2d Cir. 2009) (rejecting tarnishment claim because reference was insufficiently negative); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 268 (4th Cir. 2007) (same; cheapness not enough); *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 507 (2d Cir. 1996) (same under state law; association with "likeable" character not actionable).

That distinction is explicitly viewpoint-based: it restricts negative, but not positive or neutral, depictions of famous marks. Like the viewpoint-discriminatory bar on registering disparaging marks, this is a "happy-talk" rule.[5] *Tam*, 582 U.S. at 246 (Alito, J., opinion of four Justices); *see also id.* at 243 (explaining the Court's "cases use the term 'viewpoint' discrimination in a broad sense" and that "[g]iving

---

[5] Notably, "disparage" and "tarnish" have essentially the same meaning. *See, e.g.*, https://www.dictionary.com/browse/disparage ("to speak of or treat slightingly; depreciate; belittle/to bring reproach or discredit upon; lower the estimation of"); https://www.dictionary.com/browse/tarnish ("to diminish or destroy the purity of; stain; sully").

offense is a viewpoint"); *id.* at 221 (Kennedy, J., concurring) (viewpoint discriminatory to allow "a positive or benign mark but not a derogatory one"); *see also Brunetti*, 588 U.S. at 388 (holding §2(a)'s bar on registering "scandalous or immoral" trademarks unconstitutional because it "permits registration of marks that champion society's sense of rectitude and morality, but not marks that denigrate those concepts"); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) ("mandating positivity" in trademarks is viewpoint-based even outside of registration context).

Dilution law allows the government to suppress the junior user's expression if that message is inconsistent with the brand message conveyed by the senior user's mark—put otherwise, it permits only viewpoints that are consistent with that message. As Justice Kennedy wrote in *Tam*:

> A subject that is first defined by content and then regulated or censored by mandating only one sort of comment is not viewpoint neutral. . . . By mandating positivity, the law here might silence dissent and distort the marketplace of ideas.
>
> . . . The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. That danger is all the greater if the ideas or perspectives are ones a particular audience might think offensive, at least at first hearing.

*Tam*, 582 U.S. at 249 (Kennedy, J., concurring); *see also R.A.V.*, 505 U.S. at 388 ("A State might choose to prohibit only that obscenity which is the most patently offensive in its prurience .... But it may not prohibit, for example, only that

9

obscenity which includes offensive political messages."); Mark P. McKenna,

Dilution and Free Speech in the U.S., Reprise,

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3352090, at 13 (2019) ("Uses

tarnish merely by creating negative connotations with the famous mark. Uses that

reflect positively on the mark, by contrast, do not tarnish. In *Tam*'s terms,

tarnishment is a happy-talk rule."); *see also* Rebecca Tushnet, Gone in 60

Milliseconds: Trademark Law and Cognitive Science, 86 Tex. L. Rev. 507, 555-58

(2008) (arguing that there is an unconstitutional mismatch between the

justifications claimed for dilution and the scope of the law).

   And tarnishment claims impose greater restrictions on speech than did the

disparagement bar to registration in *Tam*, since they enable owners of famous

marks to completely suppress nonconfusing uses, whereas a party denied a

registration can still continue to use the mark. *Cf. Brunetti*, 588 U.S. at 401

(Roberts, C.J., concurring) (noting that denial of registration "does not affect the

extent to which their owners may use them in commerce to identify goods. No

speech is being restricted; no one is being punished. The owners of such marks are

merely denied certain additional benefits associated with federal trademark

registration.").

   The fact that §2(a) targeted uses that disparaged persons or groups was

enough to make the provision viewpoint-based even though that provision was

evenhanded in applying "equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue." *Tam*, 582 U.S. at 243 (Alito, J., opinion of four Justices). Tarnishment is even more clearly viewpoint-based: Federal law provides special extra protection for the reputation of "famous" marks. 15 U.S.C. § 1125(c)(2)(C). Tarnishing a nonfamous mark is fine. Jack Daniel's is protected from parody if it is famous; a local brewer cannot be. To those who have, more is given, tilting the marketplace of ideas in their favor. *Cf. Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment ….").

The fact that the audience's reaction determines whether a use is tarnishing does not change the viewpoint-based nature of the rule.  "The Government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience. . . . Indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise." *Tam*, 582 U.S at 250 (Alito, J., opinion of four Justices).

Viewpoint-based restrictions are anathema to the First Amendment. This is not one of the rare cases where an overriding government interest justifies an exception to that rule. *See Wandering Dago*, 879 F.3d at 39 (striking down

viewpoint-based restriction on use of trademarks). JDI is concerned that Bad Spaniels will pollute the meaning of its mark. But that evaluation is for citizens in the marketplace of ideas.

## II. Even if Tarnishment Weren't Viewpoint-Based, It Would Be Content-Based and Fail Both Strict and Intermediate Scrutiny

In *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the Court held that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165.[6]

Although the Supreme Court has repeatedly declined to decide whether all uses of trademarks count as "commercial speech," this Court need not wade into that issue because the justification for tarnishment does not involve protecting consumers from deception or providing them with truthful information. As Justice Thomas wrote, "when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial.'" *Tam*, 582 U.S at 254 (Thomas, J., concurring); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S.

---

[6] *Reed* plainly rejected the reasoning in *San Francisco Arts & Athletics v. U.S. Olympic Committee*, 483 U.S. 522 (1987), that applied minimal scrutiny to a law directed at specific trademarks because of Congress's beneficial motive in passing it. *Compare id.* at 534-35 *with Reed*, 576 U.S. at 163-64.

484, 503 (1996) (plurality opinion) ("Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond 'irrationally' to the truth. The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.") (cleaned up).

Tarnishment is content-based because a defendant's speech is unlawful only if (1) its similarity to a famous mark causes association with that mark—requiring an evaluation of its content—and (2) that association has the effect of harming the famous mark's reputation, which is a speech-based effect rather than an effect caused by noncommunicative elements of the accused use. *See City of Austin v. Reagan National Advertising, LLC*, 596 U. S. 61, 74 (2022); *cf. Vidal v. Elster*, 602 U.S. 286, 294-95 (2024) (acknowledging that a trademark restriction that turns on the content of the trademark is content-based). As the leading trademark treatise puts it, "[t]he difficulty with reconciling dilution by tarnishment with free speech is that if the famous trademark owner's complaint is based on injury caused by the defendant's criticism, then this is exactly the kind of communication that free speech principles are supposed to protect." Thomas McCarthy, McCarthy on Trademarks § 24:90 (5th ed. 2021).

13

## A. Tarnishment Lacks a Historical Foundation for Its Speech-Suppressive Effects

Notably, tarnishment does not require confusion—the historical foundation of trademark law—or any other false or misleading assertions of fact. 15 U.S.C. § 1125(c)(1) (barring tarnishment "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury"). As Laura Heymann puts it: "A dilution action essentially argues . . . '[W]e have spent a lot of money and effort on telling consumers what they should think about our brand, and the defendant's activities have caused them to think something different.' . . . The brand owner, in other words, is claiming a right to the exclusive mental association with the brand in the minds of the public." Laura A. Heymann, Metabranding and Intermediation: A Response to Professor Fleischer, 12 Harv. Negot. L. Rev. 201, 218–19 (2007).

Thus, tarnishment forbids certain speakers from giving a new meaning to another's famous trademark, even without falsity. This lack of connection to confusion means that the usual interests protected by trademark law—protecting consumers against confusion and trademark owners against usurpation of business consumers intend to give them—do not apply.

Tarnishment prohibitions were unknown to the founding generations (and to the framers of the Reconstruction Amendments). Until the twentieth century,

14

trademark protection guarded only against "passing off." *See, e.g.*, *Borden Ice Cream Co. v. Borden's Condensed Milk Co.*, 201 F. 510 (7th Cir. 1912) (holding that trademark protection was limited to confusing uses on competing goods); Mark P. McKenna, The Normative Foundations of Trademark Law, 82 Notre Dame L. Rev. 1839, 1858-63 (2007) (detailing the history). Tarnishment as an actionable concept was invented in the early decades of the twentieth century. Sarah L. Burstein, Dilution by Tarnishment: The New Cause of Action, 98 Trademark Rep. 1189, 1192 (2008). Most accounts trace dilution to a 1927 proposal by Frank Schechter. *See* Frank I. Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813, 829 (1927); *see also* McCarthy, supra, § 24:67 (explaining that Schechter's 1927 proposal was more limited than what Congress enacted in the Federal Trademark Dilution Act of 1995 and revised in 2006).

Dilution by tarnishment therefore lacks the hundreds of years of tradition that the Supreme Court relied on to uphold a registration bar on the use of another's name without permission, which meant that the applicant could not register TRUMP TOO SMALL as a trademark without Donald Trump's consent. *Elster*, 602 U.S. at 301 ("This history and tradition is sufficient to conclude that the names clause—a content-based, but viewpoint-neutral, trademark restriction—is compatible with the First Amendment."). *Elster* found the bar on registering

trademarks that include a living person's name without that person's consent historically justified. Moreover, unlike merely refusing the benefits of trademark registration while continuing to allow the sale of goods bearing the phrase TRUMP TOO SMALL, a dilution injunction actually suppresses ongoing speech.

While consumers' confusion about source provides the necessary historical foundation for prohibiting *deceptive* uses without additional First Amendment scrutiny, the Court has repeatedly emphasized that the traditional categories of unprotected speech cannot be expanded based merely on a legislature's determination of the speech's low value. *See, e.g.*, *Stevens*, 559 U. S. at 468. Congress's decision in 1995—centuries after trademark law's emergence—to expand the law beyond barring "confusing" uses to banning "tarnishing" uses thus requires constitutional scrutiny.

**B.     Commercial Use Is Not Relevant to the First Amendment Inquiry**

Regardless of how trademarks are classified along the commercial/noncommercial axis, tarnishment does not implicate the reason that commercial speech can be more readily regulated than other speech: the need to protect consumers from harm. *See 44 Liquormart*, 517 U.S. at 502 (opinion of three Justices) ("It is the State's interest in protecting consumers from commercial harms that provides the typical reason why commercial speech can be subject to

16

greater governmental regulation than noncommercial speech.") (cleaned up); *cf.*
*Tam*, 582 U.S. at 251 (Kennedy, J., concurring) ("To the extent trademarks qualify
as commercial speech, they are an example of why that term or category does not
serve as a blanket exemption from the First Amendment's requirement of
viewpoint neutrality.").

Additionally, the Supreme Court found that VIP's speech was not
"noncommercial use" for purposes of applying 15 U.S.C. § 1125(c)(3)(C)'s
exclusion because VIP was making a use as a mark. *VIP I*, 599 U.S. at 162
(emphasis added). However, that finding does not mean that VIP's speech was
commercial speech for First Amendment purposes. As Jennifer Rothman has
explained, intellectual property jurisprudence often focuses on commercial "use"—
whether speech is sold in the marketplace— which is a different inquiry than the
First Amendment's stringent test for "commercial speech." Jennifer E. Rothman,
Commercial Speech, Commercial Use, and the Intellectual Property Quagmire,
101 Va. L. Rev. 1929 (2015).

Congress cannot by statute reconfigure the boundaries of the First
Amendment. For First Amendment purposes, commercial speech is regularly
defined as speech that does no more than propose a commercial transaction. *U.S. v.
United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Mattel, Inc. v. MCA Records, Inc.*,
296 F.3d 894, 900 (9th Cir. 2002) (same; rejecting infringement claim against

17

song).  That is, commercial speech is an offer to sell something other than the speech itself.

By contrast, speech that is itself the expressive product being sold is noncommercial for First Amendment purposes, even when sold for profit.  *See, e.g., Brown*, 564 U.S. at 790 (video games); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."); *Smith v. California*, 361 U.S. 147, 150 (1959) (same); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996) ("Cardtoons' trading cards . . . are not commercial speech—they do not merely advertise another unrelated product. Although the cards are sold in the marketplace, they are not transformed into commercial speech merely because they are sold for profit.").

Thus, courts routinely apply stringent First Amendment scrutiny when articles sold in the marketplace are restricted because of the message they bear. *See, e.g.*, *Gaudiya Vaishnava Soc'y v. City & Cnty. of S.F.*, 952 F.2d 1059, 1063-65 (9th Cir. 1990) (message-bearing items such as T-shirts and jewelry were noncommercial speech despite being sold); *Ayres v. City of Chicago*, 125 F.3d 1010, 1014 (7th Cir. 1997) ("[T]here is no question that the T-shirts are a medium of expression prima facie protected by the free-speech clause of the First

Amendment, and they do not lose their protection by being sold rather than given away."); *cf., e.g., Cohen v. California*, 403 U.S. 15 (1971) (jacket bearing message was fully protected by First Amendment); *Schoenecker v. Koopman*, 349 F. Supp. 3d 745, 751 (E.D. Wis. 2018) ("[T]he shirts themselves are pure speech, in that they contain images and words that convey a message. The message may be ambiguous and open to interpretation, … but this does not deprive it of First Amendment protection. Rather, 'a narrow, succinctly articulable message is not a condition of constitutional protection.'") (*citing Hurley v. Irish-American Gay, Lesbian & Bisexual Gp.*, 515 U.S. 557, 569 (1995)).

## C.    Protecting Reputation Against Nondefamatory Criticism Is Not a Legitimate Government Interest

Trademark law is undoubtedly constitutional when it regulates false and misleading statements in commercial speech.  See Lisa P. Ramsey, Free Speech Challenges to Trademark Law After Matal v. Tam, 56 Hous. L. Rev. 401, 429 (2018). But this justification "offers no support for dilution statutes," which are not limited to false or misleading speech.  Mark A. Lemley & Eugene Volokh, Freedom of Speech and Injunctions in Intellectual Property Cases, 48 Duke L.J. 147, 221 n. 325 (1998). Content-based distinctions turning on confusion, which interferes with source identification, has a long historical pedigree; content-based distinctions turning on fame or non-confusion reasons do not. In Justice Barrett's

19

words, "[c]ontent-based criteria for trademark registration do not abridge the right to free speech so long as they reasonably relate to the preservation of the markowner's goodwill *and* the prevention of consumer confusion." Vidal, 602 U.S. at 318 (Barrett, J., concurring) (emphasis added). If it were otherwise, trademark law could punish, for example, references to abortion, birth control, or guns—even though those content-based exclusions would have nothing to do with preventing confusion.

Strict scrutiny requires a "compelling" government interest; intermediate scrutiny requires a "substantial" one. *See, e.g.*, *Porter v. Martinez*, 68 F.4th 429, 439 (9th Cir. 2023). Even if tarnishment were subject to intermediate rather than strict scrutiny as a regulation of truthful commercial speech, the government would still lack a sufficient interest to justify the suppression of nondefamatory speech.

To justify a content-based regulation, the government "must specifically identify an actual problem in need of solving, . . . and the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799 (cleaned up). This "is a demanding standard." *Id.* Even when speech is sold in the marketplace, content-based restrictions must be carefully justified. *Id.* at 790. Tarnishment fails this requirement. Liability for tarnishment does not require proof of actual harm to the trademark owner, economic or otherwise. 15 U.S.C. § 1125(c)(1); *JDI II*, 2025 WL 275909, at *18 (relying on lack of actual harm

requirement in reasoning that VIP's parody should be enjoined). The statute directs courts to presume *irreparable* harm upon a showing of likely success on the merits. § 1116. Courts regularly infer tarnishment based on mere conjecture. *See, e.g.*, *V Secret Catalogue, V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382, 389 (6th Cir. 2010) (noting that harm was speculative but reasoning that statute created a presumption of tarnishment for sex-related uses); Michael Handler, What Can Harm the Reputation of a Trademark? A Critical Re-evaluation of Dilution by Tarnishment, 106 Trademark Rptr. 639, 672–675 (2016) (discussing unwarranted inferences of harm). These presumptions and speculations further uncouple tarnishment from a valid purpose or appropriate tailoring.

The government's putative interest in tarnishment is in preventing nondefamatory harm to a famous mark's reputation.[7] This is the opposite of a legitimate government interest. Contesting meaning, in the absence of deception, is at the heart of a system of free expression. There is no compelling or substantial interest in suppressing a message out of fear that it might lead audiences to think

---

[7] To the extent that this control over meaning has economic value, tarnishment is far from the least restrictive means of rewarding the owners of famous trademarks. Congress could give them tax breaks or other subsidies; economic measures less restrictive than suppressing speech can be used to promote favored entities in the product market. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (possibility of economic regulation to achieve goal indicated that banning nondeceptive commercial speech was more extensive speech regulation than necessary under intermediate scrutiny).

differently. Mary LaFrance, *No Reason to Live: Dilution Laws as Unconstitutional Restrictions on Commercial Speech*, 58 S.C. L. Rev. 709, 719 (2007) ("[A]ny harm to the value of the trademarks affected by dilutive speech interferes only with the ability of the trademark owners to psychologically manipulate consumers. Preserving the ability of trademark owners to influence consumers in this way does not amount to a substantial governmental interest."); Ramsey, *supra*, at 443-61 (similar).

*Tam* confirmed that the government lacks even a substantial interest in suppressing a message out of fear that it might convince audiences to disrespect a trademark, affecting the amount of attention and goodwill the trademark can command:

> The commercial market is well stocked with merchandise that disparages prominent figures and groups, and the line between commercial and non-commercial speech is not always clear, as this case illustrates. If affixing the commercial label permits the suppression of any speech that may lead to political or social "volatility," free speech would be endangered.

*Tam*, 582 U.S at 247 (Alito, J., opinion of four Justices).

The government lacks a valid interest in protecting reputations from non-factual, non-falsifiable claims, whether or not there is "trademark use." When the harm sought to be avoided is change in third parties' opinions (as opposed to, for example, physical violence), defamation law has provided a detailed map of what the law may not suppress. Defamation requires a false or misleading statement of

fact, even though derogatory opinions can cause harm, including economic harm. For example, the deliberate infliction of emotional distress on specific targets is regularly protected by the First Amendment.[8]

The Supreme Court has held that even definable damage to a plaintiff is not enough to justify relief when a well-known plaintiff is made the target of savage insults, including associations with incest, but not defamed. *Hustler Magazine v. Falwell*, 485 U.S. 46, 51-53 (1988). Lower courts have recognized that attempts to protect "reputation" must follow the same constitutional rules, even if the harm is relabeled. *New York Stock Exchange, Inc. v. Gahary*, 196 F.Supp.2d 401, 412-13 & n.17 (S.D.N.Y. 2002) (applying *Hustler* to parody; trademark liability would be "at odds with the principles articulated in that case"); *Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union*, 585 F. Supp. 2d 815, 820-21 (E.D. Va. 2008) ("[I]f a plaintiff seeks damages which are 'reputational' in nature, constitutional libel standards (i.e., falsity and actual malice) apply to the plaintiff's damage claims. To allow otherwise would be to countenance 'an end-run around

---

[8] *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (public speech on a matter of public concern "cannot be restricted simply because it is upsetting or arouses contempt. 'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' Indeed, 'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.' ") (citations omitted).

23

First Amendment strictures.' . . . [T]he label of the claim is not dispositive …."
(quoting *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir.
1999))); *see also Compuware Corp. v. Moody's Investors Servs., Inc.*, 499 F.3d
520, 530 (6th Cir. 2007) (same); *Beverly Hills Foodland, Inc. v. United Food &
Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (same).

As the *Tam* Court made clear, we are more likely to get to the truth if we
have a marketplace of ideas and information rather than suppression of the
messages of the weak by the strong because of a concern about preserving the
reputation of celebrated brands. Allowing audiences to choose from a variety of
competing meanings, experiences, and opinions is generally a First Amendment
value, not a harm to be avoided. As Laura Bradford has explained:

> Typically interlopers that evoke famous marks in advertising subtly reveal to
> consumers alternative understandings such as that some segment of the
> public thinks the brand is pretentious, a bad value, or simply over-exposed.
> Even if consumers process the new message only subconsciously,
> automatically, and involuntarily, as they do with much authorized brand
> advertising, a resulting increase in negative feelings about the dominant
> brand may well be welfare-enhancing and efficient.

Laura R. Bradford, Emotion, Dilution, and the Trademark Consumer, 23 Berkeley
Tech. L.J. 1227, 1237 (2008) (footnote omitted).[9]

---

[9] Again, the empirical evidence indicates that dilution protection is irrelevant to
famous marks. *See, e.g.*, Maureen Morrin & Jacob Jacoby, *Trademark Dilution:
Empirical Measures for an Elusive Concept*, 19 J. Pub. Pol'y & Marketing 265,

24

Even if fixing meaning to favor current owners of famous trademarks were a legitimate interest, there is no good evidence that suppressing speech through dilution law can accomplish this, as required by both strict and intermediate scrutiny. *See, e.g.*, Barton Beebe et al., Clearing Up Some Confusion About Dilution: A Reply to Hal Poret, 112 Trademark Rptr. 684, 689 (2022) ("Professor Christine Haight Farley has challenged dilution proponents to provide even a single concrete, non-hypothetical example of a mark that has been significantly damaged because another business has used that mark in a non-confusing manner on different goods. As far as we know, no one has answered Farley's call for evidence. And given that the dilution cause of action remains essentially a hypothesis as opposed to a documented phenomenon, the burden of proof, in our view, lies heavily on dilution's proponents."); Christopher Buccafusco et al., Testing Tarnishment in Trademark and Copyright Law: The Effect of Pornographic Versions of Protected Marks and Works, 94 Washington University L. Rev. 341 (2016) (finding that "tarnishing" uses are unlikely to harm the originals and may increase consumer preference for them); Jake Linford, Justin

---

274 (2000) ("It appears that very strong brands are immune to dilution because their memory connections are so strong that it is difficult for consumers to alter them or create new ones with the same brand name."); *cf. United States v. Alvarez*, 567 U.S. 709, 726 (2012) ("The Government point[ed] to no evidence to support its claim that the public's general perception of military awards is diluted by false claims such as those made by Alvarez.").

Sevier, & Allyson Willis, Trademark Tarnishmyths, 55 Ariz. St. L.J. 609, 618
(2023) ("The results of these experiments suggest that the case for tarnishment
might be weak in circumstances where courts have been most willing to presume
tarnishment occurs. Indeed, much of what courts have presumed about the
tarnishing effect of sex-, drug-, and sacrilege-related uses may be more mythic
than material.").[10]  Multiple intervening causes, including the trademark owner's
own ordinary advertising efforts, are likely to prevent the posited harm. *See*
Tushnet, *supra*, at 541 ("[R]epeated exposure to Starbucks, which will occur
whether or not a competing coffee store offers a 'Charbucks' blend, can reinforce
the original against any threat. Indeed, in the dilution experiments, certain well-
known brands resist dilution entirely even without reminder ads.") (citations
omitted).

The Court in *Brown* rejected as insufficient a far more empirically developed
claim about the causal relationship between violent video games and harm to
youth. 564 U.S. at 799–800. Tarnishment, like restrictions on violent video games
and on price advertising, is based on unacceptable "speculation and conjecture," *44*

---

[10] *See also* Barton Beebe et al., Testing for Trademark Dilution in Court and in the
Lab, 86 U. Chi. L. Rev. 611 (2019) (explaining the weaknesses of empirical claims
about dilution); Rebecca Tushnet, Gone in 60 Milliseconds: Trademark Law and
Cognitive Science, 86 Tex. L. Rev. 507, 526-46 (2008) (same).

*Liquormart*, 517 U.S. at 507 (plurality), that preventing nonconfusing use of trademarks in commercial speech would preserve famous marks' distinctiveness.

Finally, it is especially important that evaluation of the government's interest not be swayed by the perception that VIP's message is "low-value." The Supreme Court has rejected, outside narrow traditional limitations, arguments that perceived "low value" speech is less deserving of First Amendment considerations or that only "high value" speech should be part of the marketplace of ideas. A symbol that has developed substantial meaning—as JDI insists is true for Jack Daniel's—is a legitimate subject of public discourse. *See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06 (1969); *United States v. Mongol Nation*, 370 F. Supp. 3d 1090, 1112 (C.D. Cal. 2019) (symbols—in that case, trademarks representing association with Mongol Nation—are First Amendment speech).

And, in any event, audiences may well disagree about the value of commentary like VIP's. Stacey Dogan and Mark Lemley have identified the importance of brand-based humor as

> a valuable form of social commentary. Even more than non-commercial forms of parody, the subversive use of a parody as brand invites critical reflection on the role of brands in society and the extent to which we define ourselves by them. Brands that parody, in other words, offer a unique platform for expression and pose little threat to trademark law's core values.

Stacey L. Dogan & Mark A. Lemley, Parody as Brand, 47 U.C. Davis L. Rev. 473, 486 (2013) (footnotes omitted).

27

**E.     Repackaging The Government's Interest Under Other Labels Fails**

Trademark law's source-identification justification does not extend to granting trademark owners rights to control how they are spoken about. The ordinary commercial case is one in which the trademark identifies for consumers which source they want: "Eveready" for a battery summarizes information about battery life and reliability for consumers. *See JDI I*, 599 U.S. at 146, 157. Tarnishment, by contrast, protects nonfactual, emotional associations, not quality guarantees—source connotation, not source identification.

Characterizing the government's interest as protecting trademark owners' property rights rather than their reputations also cannot save the statute. Trademarks are nonrivalrous—unlike a car, more than one person can use them at once, and so one person's nonconfusing use does not expropriate another's property right. More broadly, as scholars have explained, any speech-suppressive interest could be reconceptualized as an intangible "property" interest to defeat a speech claim. Eugene Volokh & Brett McDonnell, Freedom of Speech and Independent Judgment Review in Copyright Cases, 107 Yale L.J. 2431, 2445-46 (1998). If the law could, by fiat, give claimants a property interest that outweighs the First Amendment, legislatures could create liability for any speech that annoys someone or disrespects them. *See Animal Legal Defense Fund v. Reynolds*, 8 F.4th 781, 793 (8th Cir. 2021) (Gruender, J., concurring and dissenting in part) (rejecting

28

claim "that the scope of First Amendment protection contracts over time as Congress 'elevate[s]' new harms to the status of legally cognizable harms for the purposes of federal law. [Such reasoning] would allow Congress to bootstrap laws into compliance with the First Amendment by elevating harms associated with the false speech that the laws regulate to the status of legally cognizable harms.") (citations omitted).

Nor is animosity to "free riding" sufficient justification. In the absence of impersonation, commentary that attracts attention by referring to a well-known entity is part of robust public discourse. *Hustler*, 485 U.S. at 51-52. The Supreme Court has previously held that the fact that one person benefits from the existence of another's speech without paying for it does not establish a compelling interest in making the first person pay. *Janus v. American Federation of State, County, & Mun. Employees*, 585 U.S. 878, 896-97 (2018).

Ultimately, tarnishment has nothing to do with the core function of trademark: allowing consumers to get the products they desire and not counterfeits. *JDI I*, 599 U.S. at 146, 157; *Tam*, 582 U.S. at 225. In the absence of defamation, if VIP's speech merely changes how audience members think about JDI, the solution is found in the marketplace of ideas, including JDI's own undoubted ability to advertise itself and what it wants the public to believe about the brand.

## CONCLUSION

Tarnishment law is the kind of paternalistic language policing that the Supreme Court has long condemned. The fear is that consumers may make "wrong" decisions because their opinion of a famous mark has changed. But, in the absence of deception, there is no "wrong" meaning of a trademark. It is for audiences themselves to make such decisions and choose their own values and interpretations.

The dilution by tarnishment cause of action is unconstitutional. It cannot be the basis for any liability.

DATED: Aug. 4, 2025    /s/  Rebecca Tushnet

Rebecca Tushnet
rtushnet@law.harvard.edu
520 Hauser, Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: 703-593-6759

Attorney for Amici Curiae Law Professors

## Appendix*

Stacey Dogan, Professor of Law, Boston University School of Law

Christine Farley, Professor, American University Washington College of Law

James Grimmelmann, Tessler Family Professor of Digital and Information Law, Cornell Tech and Cornell Law School

Laura A. Heymann, James G. Cutler Professor of Law, William & Mary Law School

Mark A. Lemley, William H. Neukom Professor, Stanford Law School

Jessica Litman, John F. Nickoll Professor of Law, University of Michigan

Mark P. McKenna, Professor of Law, UCLA School of Law

Lisa Ramsey, Professor of Law, University of San Diego School of Law

Betsy Rosenblatt, Tom J.E. and Bette Lou Walker Professor of Law, Case Western Reserve University School of Law

Jessica Silbey, Professor of Law, Boston University School of Law

Christopher Jon Sprigman, Murray and Kathleen Bring Professor of Law, NYU Law

Rebecca Tushnet, Frank Stanton Professor of the First Amendment, Harvard Law School

Eugene Volokh, Thomas M. Siebel Senior Fellow, Hoover Institution at Stanford University & Gary T. Schwartz Distinguished Professor of Law Emeritus, UCLA School of Law

*Affiliations provided solely for purposes of identification.

## CERTIFICATE OF COMPLIANCE

Pursuant to the Fed. R. App. P. 32(g), I hereby certify that:

This brief complies with the type volume limitations of Ninth Circuit Local Rule 29.1(A)(5) because it contains 6814 words as calculated by the word count feature of Microsoft Word, exclusive of the sections exempted by Fed. R. App. P. 32(f) and including words in images.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5)(A) and (a)(6) because it uses 14-point proportionally spaced Times New Roman font.

Dated: Aug. 4, 2025 /s/ Rebecca Tushnet

Rebecca Tushnet
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
rtushnet@law.harvard.edu
Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Amici Curiae Law Professors in Support of Appellant with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on Aug. 4, 2025. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECC system.

Dated: Aug. 4, 2025 /s/ Rebecca Tushnet

Rebecca Tushnet
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
rtushnet@law.harvard.edu
Counsel for Amici Curiae