No. 25-2027

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

## VIP PRODUCTS LLC,

*Plaintiff/Counterdefendant-Appellant,*

v.

## JACK DANIEL'S PROPERTIES, INC.,

*Defendant/Counterclaimant-Appellee.*

On Appeal from the United States District Court
for the District of Arizona
No. 2:14-cv-02057-SMM
Hon. Stephen M. McNamee, Presiding

## REPLY BRIEF OF VIP PRODUCTS LLC

> DICKINSON WRIGHT PLLC
> Bennett Evan Cooper
> David G. Bray
> Vail C. Cloar
> Alexandra Crandall
> 1850 N. Central Ave., Suite 1400
> Phoenix, Arizona 85004
> (602) 285-5000
>
> Attorneys for VIP Products LLC

## TABLE OF CONTENTS

*Page*

Table of Contents.................................................................2

Table of Authorities............................................................4

Introduction .......................................................................9

Argument ..........................................................................11

I.    JDPI's attempt to leverage "Jack Daniel's" to protect its nonfamous marks relies on a flawed interpretation of the TDRA. ...............................................................................11

    A.    The TDRA's text does not support JDPI's argument. .......... 12

    B.    There is no pre-TDRA "tarnishment" history that informs the TDRA's plain language. ...................................14

    C.    JDPI fails to identify any support for the district court's finding that JDPI's ancillary marks are famous...............................................................................19

    D.    The district court erred in finding tarnishment on the facts of this case. ..............................................................22

II.    The TDRA tarnishment provision constitutes impermissible viewpoint discrimination in violation of the First Amendment. ...............................................................29

    A.    JDPI fails to justify the district court's holding that VIP waived its constitutional challenge...............................29

    B.    Dilution by tarnishment is unconstitutional because it facially discriminates based on viewpoint.........................32

        1.    Section 1125(c) facially prohibits speech based on viewpoint. ...............................................................32

2

2.    JDPI's conception of tarnishment would eliminate parodic marks. ..............................................34

   C.    Section 1125(c) has nothing to do with the quality of goods. ..................................................................35

Conclusion ..............................................................................37

Certificate of Compliance ......................................................38

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Am. Freedom Def. Initiative v. King County,*
904 F.3d 1126 (9th Cir. 2018)...................................................33

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.,*
963 F.3d 859 (9th Cir. 2020)....................................................19

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994)...............................................27, 33, 35

*Chem. Corp. of Am. v. Anheuser-Busch, Inc.*
306 F.2d 433 (5th Cir. 1962)...................................................16

*Concordia v. Bendekovic,*
693 F.2d 1073 (11th Cir. 1982).................................................30

*Coty Inc. v. Excell Brands, LLC,*
277 F. Supp. 3d 425 (S.D.N.Y. 2017)........................................36

*Deere & Co. v. MTD Prods., Inc.,*
41 F.3d 39 (2d Cir. 1994)........................................................36

*Enyart v. Nat'l Conf. of Bar Exam'rs,*
630 F.3d 1153 (9th Cir. 2011)..................................................29

*H-D U.S.A., LLC v. SunFrog, LLC,*
311 F. Supp. 3d 1000 (E.D. Wis. 2018)......................................36

*Hasbro, Inc. v. Internet Ent. Grp., Ltd.,*
1996 WL 84853 (W.D. Wash. Feb. 9, 1996).................................17

*Healy Tibbitts Constr. Co. v. Ins. Co. of N. Am.,*
679 F.2d 803 (9th Cir. 1982).............................................30, 31

*Hormel Foods Corp. v. Jim Henson Prods., Inc.,*
73 F.3d 497 (2d Cir. 1996)...............................................23, 28

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ........................................................ 31, 32, 33, 35

*John R. Sand & Gravel Co. v. United States,*
552 U.S. 130 (2008) ................................................................... 30

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.,*
828 F.2d 1482 (10th Cir. 1987) .................................................. 27, 28

*L.L. Bean, Inc. v. Drake Publ'rs, Inc.,*
811 F.2d 26 (1st Cir. 1987) ......................................................... 33

*Liberty Mut. Ins. Co. v. E.E.O.C.,*
691 F.2d 438 (9th Cir. 1982) ....................................................... 19

*Lorillard Tobacco Co. v. Cal. Imps., LLC,*
886 F. Supp. 2d 529 (E.D. Va. 2012) ........................................... 18

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,*
507 F.3d 252 (4th Cir. 2007) ............................................ 23, 25, 26, 27

*M2 Software Inc. v. Viacom Inc.,*
223 F. App'x 653 (9th Cir. 2007) ................................................. 19

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.,*
703 F. Supp. 2d 671 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410
(6th Cir. 2012) ......................................................................... 21

*Matal v. Tam,*
582 U.S. 218 (2017) .......................................................... 31, 33, 35

*Mattel Inc. v. Jcom Inc.,*
1998 WL 766711 (S.D.N.Y. Sept. 11, 1998) ................................ 17

*Mattel, Inc. v. MCA Records, Inc.,*
296 F.3d 894 (9th Cir. 2002) ...................................................... 33

*Mintz v. Subaru of Am., Inc.,*
716 F. App'x 618 (9th Cir. 2017) ................................................ 11

*N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC,*
293 F.3d 550 (2d Cir. 2002) ........................................................ 36

*New Kids on the Block v. News Am. Publ'g, Inc.,*
971 F.2d 302 (9th Cir. 1992)......................................................14

*Owens v. Kaiser Found. Health Plan, Inc.,*
244 F.3d 708 (9th Cir. 2001).................................................29, 31

*Pado, Inc. v. SG Trademark Holding Co.,*
527 F. Supp. 3d 332 (S.D.N.Y. 2021)..........................................13

*Pfizer Inc. v. Sachs,*
652 F. Supp. 2d 512 (S.D.N.Y. 2009)...........................................18

*Polo Ralph Lauren L.P. v. Schuman,*
1998 WL 110059 (S.D. Tex. Feb. 9, 1998).....................................17

*Rivera v. Anaya,*
726 F.2d 564 (9th Cir. 1984)..................................................30, 31

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
515 U.S. 819 (1995)..............................................................33, 34

*S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.,*
483 U.S. 522 (1987).............................................................15, 34

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,*
588 F.3d 97 (2d Cir. 2009) ..........................................23, 25, 26, 27

*Steinway & Sons v. Robert Demars & Friends,*
1981 WL 40530 (C.D. Cal. Jan. 28, 1981)................................16, 17

*Stetson v. Howard D. Wolf & Assocs.,*
955 F.2d 847 (2d Cir. 1992) ......................................................13

*Stevo Design, Inc. v. SBR Mktg. Ltd.,*
919 F. Supp. 2d 1112 (D. Nev. 2013)..........................................14

*Tiffany & Co. v. Bos. Club, Inc.,*
231 F. Supp. 836 (D. Mass. 1964)................................................17

*Toys "R" Us, Inc. v. Akkaoui,*
No. C 96-3381 CW, 1996 WL 772709 (N.D. Cal. Oct. 29,
1996) .................................................................................17

*United States v. Castellanos,*
608 F.3d 1010 (8th Cir. 2010) .............................................................. 19

*V Secret Catalogue, Inc. v. Moseley,*
605 F.3d 382 (6th Cir. 2010) ................................................................ 18

*Vallavista Corp. v. Amazon.com, Inc.,*
657 F. Supp. 2d 1132 (N.D. Cal. 2008) ............................................... 21

*Vidal v. Elster,*
602 U.S. 286 (2024) .............................................................................. 34

*Wakefield v. ViSalus, Inc.,*
51 F.4th 1109 (9th Cir. 2022) .............................................................. 30

## Statutes and Rules

15 U.S.C. § 1114(1)(a) ................................................................................ 13

15 U.S.C. § 1125(a)(1) ................................................................................ 13

15 U.S.C. § 1125(c) ............................. 10, 17, 22, 23, 24, 32, 33, 34, 35, 36

15 U.S.C. § 1125(c)(1) ................................................................................ 13

15 U.S.C. § 1125(c)(2)(A)(iii) ..................................................................... 22

15 U.S.C. § 1125(c)(2)(C) ............................................................... 16, 18, 35

15 U.S.C. § 1127(A)(1) ............................................................................... 13

Fed. R. Civ. P. 8(c) ......................................................................... 10, 29, 31

## Other Authorities

Suneal Bedi & David Reibstein, *Measuring Trademark
Dilution by Tarnishment,* 95 Ind. L.J. 683 (2020) .............................. 26

Barton Beebe, *A Defense of the New Federal Trademark
Antidilution Law,* 16 Fordham Intell. Prop. Media & Ent.
L.J. 1143 (2006) .................................................................................. 15

Shari S. Diamond & Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* (2022) ...................................................................... 21

Stacey L. Dogan & Mark A. Lemley, *The Trademark Use Requirement in Dilution Cases*, 24 Santa Clara Computer & High Tech. L.J. 541, 555 (2007) ...................................................... 14

Jake Linford et al., *Trademark Tarnishmyths*, 55 Ariz. St. L.J. 609 (2023) ............................................................. 26

*McCarthy on Trademarks and Unfair Competition* (5th ed. 2025) ............................................... 11, 12, 14, 15, 16, 21

Lisa P. Ramsey, *Trademarks and Free Speech: Conflicts and Resolutions* 201 (2026) ...................................................... 33

Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 Harv. L. Rev. 813 (1927) ............................................ 15

## INTRODUCTION

"Bad Spaniels" is a "wide-eyed" bystander in this case. 1-ER-9. Though it is the only aspect of VIP's toy that is remotely similar or correlative to JDPI's "Jack Daniel's" mark, JDPI's President testified that it was not a problem. 2-ER-422–23. JDPI's tarnishment expert, Itamar Simonson, never opined that "Bad Spaniels" was tarnishing *or* created any tarnishing associations—he never mentioned it. 2-ER-296–97. And JDPI used "Bad Spaniels" *on a wine-bottle shaped dog toy* as a survey control. 6-ER-1472. Now that the district court and JDPI have abandoned the alternative argument that *any* association of "Jack Daniel's" *with a dog toy* is tarnishing, they are forced to rely on an allegedly tarnishing association created by the purported similarity of *nonfamous* elements to parodies of them. This case is unlike any other TDRA or pre-TDRA tarnishment case, where the gravamen was the use of the famous mark itself (or a nearly identical variant) on sex- or drug-related products. The TDRA's plain language, legislative history, academic commentary, and precedent do not allow a tarnishment claim on the theory that "Bad Spaniels" was in the neighborhood.

JDPI offers nothing to support the district court's erroneous findings that anything other than the "Jack Daniel's" name was a "household name" among the general population—not the niche market of whiskey drinkers. Because the tarnishment claim was an afterthought (as is common), JDPI seems not to have tried.

9

The same is true of reputational harm: the only support was Itamar Simonson's *ipse dixit*, and he never opined that VIP's use of the "Bad Spaniels" mark tarnished "Jack Daniel's." He offered only a bold hypothesis about a couple of poo jokes (not "Bad Spaniels") that he did nothing to test, and that did not account for the fact that the jokes were on a parody toy.

JDPI's procedural and substantive arguments about the constitutionality of the tarnishment provision are meritless. The district court's finding of waiver relied on a misapplication of Rule 8(c), and this Court has never required that an affirmative defense based on a purely legal question be raised in the answer—particularly where the precedential basis did not exist at the time, and the opposing party could not show prejudice.

On the merits, JDPI cannot overcome the presumption of unconstitutionality for a statute that, like the tarnishment provision, discriminates based on viewpoint. Regardless of the level of scrutiny, a statute that permits praise while prohibiting "harm" to reputation cannot pass muster under the First Amendment. Although JDPI tries to tie the tarnishment statute to *some* viewpoint-neutral application, it relies on inapposite case law analyzing truly viewpoint-neutral statutes and pre-TDRA state-law cases that lack any connection to § 1125(c)'s language.

10

## ARGUMENT

**I. JDPI's attempt to leverage "Jack Daniel's" to protect its nonfamous marks relies on a flawed interpretation of the TDRA.**

JDPI attempts to stand on its "Jack Daniel's" mark to claim protection against tarnishment for other marks or label information ("Old No. 7" and a federally mandated ABV notice) even though they are not themselves famous marks—"household names"—protectable under the TDRA. This leveraging is unique because JDPI has admitted that "Bad Spaniels" itself is innocuous—neither confusingly similar nor tarnishing—and it has dropped any argument that the type of goods bearing "Bad Spaniels"—dog toys—are tarnishing (it has never claimed that VIP's products were "shoddy" or anything other than fine pet toys). This case is unlike any other because it rests solely on *other communicative content* on the label, rather than the similarity between "Jack Daniel's" and "Bad Spaniels." JDPI ignores this Court's recognition that a TDRA claim fails where the plaintiff "cannot plausibly allege that any 'association' will arise from a 'similarity' between the marks," *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 621 (9th Cir. 2017), and *McCarthy*'s acknowledgment that "[t]he required 'association' must be created *solely* by the similarity of the conflicting marks, not from some other source." *McCarthy on Trademarks and Unfair Competition* § 24:117 (5th ed. 2025) (emphasis added).

11

To ground its unprecedented theory in something, JDPI argues that the TDRA's reference to "use" allows the court to protect against tarnishment by any content with which the similar mark is "used." JDPI Br. 28–36. But no court, legislative history, or academic commentator supports any such notion of a "supermark" that enjoys protection from something other than a mark-to-mark comparison. Any such view would undermine the legislative goal of limiting dilution protection to the narrow class of truly "famous" marks that amount to "household names." VIP Opening Br. 32–33. The TDRA's new "fame" limitation is critical: without it, "an antidilution statute becomes a rogue law that turns every trademark, no matter how weak, into an anti-competitive weapon." *McCarthy*, *supra*, § 24:104.

### A.     The TDRA's text does not support JDPI's argument.

JDPI's only textual argument is to point to the TDRA's reference to "use" and then cite the appearance of that word in cases and commentary—all without offering any definition of "use" that requires consideration of everything else on the label, including purely communicative content like parodic jokes. JDPI Br. 28–36. "Use" under the TDRA—and under the Lanham Act generally—has a specific meaning that JDPI never acknowledges. The TDRA provides that "the owner of a famous mark … shall be entitled to an injunction against another person who … commences *use* of a mark or trade name in

commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark." 15 U.S.C. § 1125(c)(1) (emphasis added). The Lanham Act uses the same word in connection with confusion-based infringement claims. *See* 15 U.S.C. § 1114(1)(a) (imposing liability on any person who shall "*use* in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark … which such *use* is likely to cause confusion" (emphasis added)); 15 U.S.C. § 1125(a)(1) (imposing liability on any person who "*uses* in commerce any word, term, name, symbol, or device, or any combination thereof … which (A) is likely to cause confusion" (emphasis added)).

In trademark statutes, "use" simply means employ as a trademark or other designation of origin; it does not sweep in everything else about the product. "'Use' of a trademark means application of the mark 'sufficient to maintain the public's identification of the mark with the proprietor.'" *Pado, Inc. v. SG Trademark Holding Co.*, 527 F. Supp. 3d 332, 341–42 (S.D.N.Y. 2021) (quoting *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 851 (2d Cir. 1992)). For example, "'[u]se' requires 'bona fide use' of a mark 'made in the ordinary course of trade, and not made merely to reserve a right in the mark.'" *Id.* at 342 (quoting 15 U.S.C. § 1127(A)(1)). In other words, "use" of a trademark involves the "attempt to identify the source of the mark with the defendant itself[,]" as opposed to a "mention" of the mark "'to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose.'"

13

*Stevo Design, Inc. v. SBR Mktg. Ltd.,* 919 F. Supp. 2d 1112, 1123 (D. Nev. 2013) (quoting *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992)).

Here, the TDRA's reference to "use" merely continues this meaning. "Congress knew how to require that the accused use be a trademark use and clearly did so in the dilution section of the Lanham Act." *McCarthy*, *supra*, § 23:11.50. "The grammatical structure of this statute is clear. The defendant's use—the thing that may cause dilution by blurring or dilution by tarnishment—is not just any use or reference to the plaintiff's famous mark, but a specific, limited class of uses—use of a term by the defendant as a 'mark or trade name.'" Stacey L. Dogan & Mark A. Lemley, *The Trademark Use Requirement in Dilution Cases*, 24 Santa Clara Computer & High Tech. L.J. 541, 551 (2007). "It follows that the only actionable 'uses' by a defendant of the plaintiff's famous mark are those in which a defendant uses a trademark or trade name to identify and distinguish its own goods and services." *Id.* at 552. Professors Dogan and Lemley concluded, "If anything, the TDRA has made it harder to prove dilution claims, not only reaffirming but actually tightening up on the universe of conduct that can be considered dilution." *Id.* at 557.

## B. There is no pre-TDRA "tarnishment" history that informs the TDRA's plain language.

JDPI acts as if the TDRA's "straightforward" meaning should be obvious from a long history of tarnishment theory and practice, JDPI Br.

14

29, but there is no such history that bears on the restrictive language Congress chose.

1.      JDPI's citation to "a seminal law review article" is meritless. JDPI Br. 7 (citing Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 Harv. L. Rev. 813, 825 (1927)). "Schechter had nothing to say about trademark 'tarnishment,'" which "has simply nothing to do with trademark dilution as Schechter originally conceived of it." Barton Beebe, *A Defense of the New Federal Trademark Antidilution Law*, 16 Fordham Intell. Prop. Media & Ent. L.J. 1143, 1145, 1150 (2006). Moreover, "Schechter's original conception has never been enacted into law, and the language of the TDRA is careful to steer clear of it." *Id.* at 1147.

2.      Before the TDRA, state dilution statutes were largely based on the 1964 or 1992 versions of the USTA (later INTA) Model State Trademark Bill, which bore little semblance to the TDRA. *McCarthy*, *supra*, §§ 24:77–24:79. Those statutes (a) largely were limited to blurring rather than tarnishment; (b) did not limit protection to "famous" marks, as opposed to distinctive or strong marks; and (c) did not specify that the tarnishment had to arise solely from the association created by the similarity of the defendant's mark to the famous mark. *See id.*; *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 564 n.25 (1987) (Brennan, J., dissenting) ("Only 'strong' trademarks are protected by [state] dilution statutes …."). In contrast, the TDRA defines "dilution by

tarnishment" as the "association *arising from the similarity between a mark or trade name and a famous mark* that harms" its reputation. 15 U.S.C. § 1125(c)(2)(C) (emphasis added).

3.    No courts adopted JDPI's "use" theory even under the broader state statutes. Indeed, while "for several decades, starting in 1947, a number of states enacted antidilution laws, … for various reasons they were seldom invoked and rarely resulted in findings of liability." *McCarthy, supra*, § 24:77.

JDPI cites no precedent for applying a tarnishment theory where the similar or analogous mark was not the "problem." That is likely because such a scenario would ignore the very definition of "dilution by tarnishment." 15 U.S.C. § 1125(c)(2)(C). In the cases JDPI does cite, the source of the tarnishment was the defendant's use of the plaintiff's mark or a virtually identical substitute. All but three were decided before adoption of the TDRA's tarnishment provision. Some involved *solely* confusion-based infringement claims, whether under state common law[1] or the Lanham Act,[2] or at least paired infringement and dilution claims

---

[1] *Chem. Corp. of Am. v. Anheuser-Busch, Inc.* 306 F.2d 433, 437 (5th Cir. 1962) (affirming injunction under state against "Where there's life … there's bugs" (instead of "Bud") where the "gist of this action" is that defendant would "make use of[] a deceptively similar slogan" that will "confuse[] the source of the defendant's product").

[2] *Steinway & Sons v. Robert Demars & Friends*, 1981 WL 40530, at *1, *4–5 (C.D. Cal. Jan. 28, 1981) (injunction against "indistinguishable"

16

attacking the defendant's identical mark.[3] Others involved *blurring* claims under state laws[4] or the pre-TDRA federal blurring provision.[5]

The three TDRA tarnishment cases that JDPI cites were all based on the tarnishing character of the *similar mark* in and of itself. The case focused on by JDPI (JDPI Br. 30–31) emphasized that its conclusion of a

---

mark for clip-on can handles that is "likely to cause confusion" as to "common origin").

[3] *Tiffany & Co. v. Bos. Club, Inc.*, 231 F. Supp. 836, 842, 844–45 (D. Mass. 1964) (enjoining use of "Tiffany's" mark for restaurant that was "out and out latter-day piracy" under Lanham Act because it was "likely to cause confusion or mistake … as to the source of origin").

[4] *Steinway*, 1981 WL 40530, at *4–5, *9–10 (enjoining use of "indistinguishable" mark that would "dilute the distinctiveness and uniqueness" of plaintiff's trademarks under state statute); *Tiffany*, 231 F. Supp. at 844–45 (enjoining under state statute use of "Tiffany's" that created "a risk of an erosion of the public's identification mark with the plaintiff alone").

[5] *Toys "R" Us, Inc. v. Akkaoui*, 1996 WL 772709, at *3–4 (N.D. Cal. Oct. 29, 1996) (injunction against Adults "R" Us for sexual-device/clothing site in light of "'R Us' family of marks," where defendants did "not contest that their use … diluted the distinctiveness of Plaintiffs' marks"); *Hasbro, Inc. v. Internet Ent. Grp., Ltd.*, 1996 WL 84853, at *1 (W.D. Wash. Feb. 9, 1996) (injunction against use of identical name "CANDYLAND to identify a sexually explicit Internet site" under § 1125(c) and state statute); *Mattel Inc. v. Jcom Inc.*, 1998 WL 766711, at *3–4 (S.D.N.Y. Sept. 11, 1998) (enjoining use of "Barbie" mark in defendant's "Barbie's Playhouse" mark for adult entertainment because it "causes dilution of the distinctive quality of the mark"); *Polo Ralph Lauren L.P. v. Schuman*, 1998 WL 110059, at *5 (S.D. Tex. Feb. 9, 1998) (granting injunction under FTDA and state statute because "use of the name THE POLO CLUB [for adult entertainment] … dilutes the distinctive quality of Plaintiff's famous Polo trademark").

likelihood of tarnishment rested on the "clear semantic association" between the "new mark used to sell sex related products" and the "famous mark." *V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382, 385, 388 (6th Cir. 2010) (tarnishment of "Victoria's Secret" by "Victor's Secret"). The same is true of the other two cases.[6]

This precedent is consistent with the statutory definition of "dilution by tarnishment" in § 1125(c)(2)(C), which requires that the similar mark be the source of the tarnishing association. JDPI might have had a chance if VIP had used "Cack Daniel's," or if it had used "Jack Daniel's" on a sex toy because of the product type for which it the famous mark was used as a trademark. But in the end JDPI had no objection to either "Bad Spaniels" or dog toys. It is left arguing that "Old No. 2" and "43% POO BY VOL." are the problem, but JDPI would have to prove that those elements are famous. As shown in the next section, they aren't.

---

[6] *Lorillard Tobacco Co. v. Cal. Imps., LLC*, 886 F. Supp. 2d 529, 536–37 (E.D. Va. 2012) (enjoining use of "Newprot" mark for "spice" smoking product because it "is not only similar, but nearly identical to Lorillard's famous mark [Newport]" for cigarettes and caused source confusion and diluting association with "controversial synthetic marijuana"); *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 524–25 (S.D.N.Y. 2009) (advertising agency's self-promoting placement of decommissioned Air Force missiles bearing plaintiff's "Viagra" and "Viva Viagra" at adult-entertainment exhibition was likely to cause confusion and tarnish plaintiff's marks).

**C. JDPI fails to identify any support for the district court's finding that JDPI's ancillary marks are famous.**

JDPI's unwarranted leveraging is apparent from its failure to identify any evidence that could support the district court's conclusion that any marks or trade dress other than "Jack Daniel's" itself were famous within the meaning of the TDRA. JDPI does not contest that the protected mark must be a "household name." VIP Opening Br. 32–33; JDPI Br. 37; *see Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 871 (9th Cir. 2020).[7]

As to the factual basis for the district court's finding, there is no supporting evidence for this Court to reweigh. JDPI claims not to understand "which specific marks VIP references" in its Opening Brief and on remand, JDPI Br. 39 n.8, but any purported vagueness is due to

---

[7] JDPI's waiver argument as to fame is so weak that the district court rejected it. JDPI Br. 39. VIP attacked JDPI's failure to prove fame in the district court the first time around. *E.g.*, Dist. Dkt. 209 at 12–13 ¶¶ 75–84 & 29–31 ¶¶ 77–90. It does not matter that VIP did not argue the fame issue in the first appeal because this Court vacated the original judgment and ultimately ordered a general remand, so "the Court's prior determinations as to dilution … do not stand as the law of the case." Dist. Dkt. 374 at 30; *see Liberty Mut. Ins. Co. v. E.E.O.C.*, 691 F.2d 438, 441 (9th Cir. 1982) (District courts "are free to decide issues on remand so long as they were not decided on a prior appeal."); *United States v. Castellanos*, 608 F.3d 1010, 1019 (8th Cir. 2010) (a party is "not required to anticipate every possible outcome on appeal and formulate a responsive argument for each alternative" (cleaned up)). JDPI's inapposite cited authority dealt with a second appeal following a *limited* remand. *M2 Software Inc. v. Viacom Inc.*, 223 F. App'x 653, 656 (9th Cir. 2007).

19

JDPI's own failure to prove an essential element of its tarnishment claim, which was seemingly treated as an afterthought.

JDPI points to the same scant support as the district court—about nine transcript pages of testimony from its parent's Global Brand Director, Phillip Epps, and 180 pages of "exhibits depicting trade dress." JDPI Br. 38. But testimonial references that are limited to the "Jack Daniel's brand," like general advertising that does not call attention to the ancillary marks, do not establish that anything other than "Jack Daniel's" is famous—much less that "Old No. 7" and "40% ALC. BY VOL. (80 PROOF)" are household names:

- No witness testified that any of JDPI's ancillary marks are "household name" or "famous." Epps limited his testimony to "Jack Daniel's." VIP Opening Br. 37–40.

- No evidence explained the size or nature of the targeted audience of any advertisements, or how those ads, which did not highlight or sometimes even depict the ancillary marks, could have established their fame among the general purchasing population.

- No evidence identified which movies or television shows JDPI products appeared in, their audience, how the products were displayed, or whether the ancillary marks were even visible or legible. *See* 2-ER-190; JDPI Br. 38.

- No evidence measures JDPI's website or social media viewership as of 2014, or demonstrates recognition by the general purchasing public (as opposed to the niche audience that seeks out those web pages).

These limitations are critical because, as VIP explained in its Opening Brief, even a "terrifically strong and focused brand" is still directed to the "niche market of whisky drinkers." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 699 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012). Even if the name "Jack Daniel's" is widely known through popular song lyrics, the fine print on the label may be virtually unknown to the average American consumer.

In short, JDPI fails to identify any evidence of fame that "goes to the heart of the matter" regarding the "extent of actual recognition of the mark." *McCarthy*, *supra*, § 24:106. JDPI presented a confusion survey for its infringement claim, but it presented no fame survey for its tarnishment claim, even though fame surveys are the standard. *E.g.*, *Vallavista Corp. v. Amazon.com, Inc.*, 657 F. Supp. 2d 1132, 1138 (N.D. Cal. 2008) (finding mark not famous, despite significant advertisements and longstanding use and registration of mark, in part because plaintiff had "not provided any survey evidence of actual recognition"); Shari S. Diamond & Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* ch. 7A & n.10 (2022) (surveys are "a natural method … to provide evidence of fame" and "are perhaps

uniquely capable of assessing '[t]he extent of *actual* recognition of the mark'" (quoting 15 U.S.C. § 1125(c)(2)(A)(iii))).

Any such survey would have had to distinguish the recognition of JDPI's own bottle from that of many whiskey brands which are distributed in bottles with similar trade-dress features, including square bottles, black labels, white lettering, and filigree:



Dist. Dkt. 228-10. But JDPI did not even try.

### D. The district court erred in finding tarnishment on the facts of this case.

JDPI's brief makes clear that the *only* support for the district court's finding that the VIP toy's jokes harmed the reputation of "Jack Daniel's" was the testimony of Itamar Simonson. JDPI Br. 14–15, 42–43. But Simonson's untested hypothesis that all poo jokes cause disgust is contrary to precedent and simply not enough as a matter of law. This Court is not beholden to the district court's interpretation of the TDRA, and what it means for a parodic use to be likely to cause dilution by tarnishment under § 1125(c) is an analysis the Court should undertake

de novo. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009).

The mere specter of negative association or speculation as to harm is insufficient to demonstrate tarnishment. "That a consumer may associate a negative-sounding junior mark with a famous mark says little of whether the consumer views the junior mark as harming the reputation of the famous mark." *Starbucks*, 588 F.3d at 110; *see Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 268 (4th Cir. 2007) (rejecting tarnishment claim based on "speculation about whether a dog could choke on the chew toys"). A "simple humorous reference" at the expense of a senior mark is unlikely to cause tarnishment, particularly when the products do not compete in the same market. *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996).

Whatever "likely to cause dilution by … tarnishment" means, the extraordinary restriction on expression embodied in § 1125(c) cannot be based on one professor's subjective and *untested* opinion. Simonson posited that the "associative network model" would lead consumers to associate dog poo with Jack Daniel's, thereby harming the brand. His simplistic syllogism amounts to this: (1) VIP's dog toy looks like a bottle of Jack Daniel's (despite its wide-eyed spaniel, innocuous name, and squeak); (2) VIP's dog toy makes dog-poo jokes; (3) the public will necessarily relate those poo jokes to Jack Daniel's; (4) poo is gross; ergo

23

(5) VIP's parody toy will harm the reputation of "Jack Daniel's." There are several problems with Simonson's logic, none of which JDPI dispels.

**1.    Failure to address "Bad Spaniels."** Simonson did not connect his analysis to the "Bad Spaniels" mark or suggest that its similarity to "Jack Daniel's" created tarnishing associations. Indeed, he never mentioned the "Bad Spaniels" mark at all. Rather, Simonson testified that "in dilution matters," the first question is, "[W]ill the *allegedly diluting product* bring to mind or call to mind the allegedly diluted mark?" 2-ER-287 (emphasis added). As explained above, that's not the test under § 1125(c). Simonson's failure to make the right inquiry is explained by his admission that, "in reaching [his] opinion, [he] didn't reference the definition of dilution by tarnishment in the Lanham Act." 2-ER-330.

**2.    Failure to test his hypothesis.** Simonson did nothing to test whether his syllogistic hypothesis was correct. Although the dilution statute looks to the effect of the similarity of the marks on the consuming public, Simonson surveyed no consumers, asked no focus groups, and cited no real-world complaints to test empirically how consumers react. He broadly cited "dozens and dozens of studies that prove beyond a doubt, the tarnishment or the negative association created by taking a food product or a beverage and associating it with defecation." 2-ER-309. But he cited no study that tested the *Bad Spaniels toy or any other parody.* In fact, he testified that even though he did not perform a particular type

of empirical survey test of whether the VIP toy tarnished the "Jack Daniel's" mark, "I do know" what "the … test would have shown in this case" "because I have conducted thousands of studies." 2-ER-339. Professorial hubris cannot replace proof.

For this reason, VIP's marketing expert, Bruce Silverman, attacked Simonson's *ipse dixit* testimony as relying on a mere "assumption" that "Bad Spaniels, the labeling on it, would elicit feelings of disgust. And that leads to everything he then says about how it affects Jack Daniel's." 3-ER-654. As Silverman explained, Simonson was "making this incredible leap that it would elicit feelings of disgust," but Simonson failed to cite "any empirical evidence that that would happen. That's just one man's opinion" that was not "projectable." 3-ER-654, 660. Although JDPI highlights the one Silverman focus-group participant who found the toy so irritating he might "want to drink a different brand," JDPI Br. 16, JDPI omits that participant was irked by the toy's *squeaker*, not its poo jokes. 3-ER-673, 704, 710.

As a matter of law, Simonson's hypothesis about how people *might* react to seeing VIP's product is rank speculation that is insufficient to demonstrate tarnishment. *E.g.*, *Starbucks*, 588 F.3d at 110; *Haute Diggity Dog*, 507 F.3d at 268. As leading scholars have recognized, while "[t]he federal standard of a 'likelihood of harm' is the appropriate standard, … courts should require plaintiffs to introduce empirical evidence" because, "[a]t its core, trademark dilution is an empirical cause

25

of action." Suneal Bedi & David Reibstein, *Measuring Trademark Dilution by Tarnishment*, 95 Ind. L.J. 683, 694 (2020). As they conclude, "It is unclear simply based upon a semantic relationship between two marks if one will tarnish another. Clear empirical proof of harm using experimental methodology is the only way to prove if there is a likelihood of trademark dilution." *Id.* Simonson substituted a hunch for proof.

It is no more likely that a consumer would find VIP's parody dog toy disgusting than Louis Vuitton's prophesized catastrophe of a dog choking on a parody toy. *Haute Diggity Dog*, 507 F.3d at 268. Indeed, a far more likely hypothesis is that consumers would favorably associate the humor and adorable canine illustration with Jack Daniel's. As the Second Circuit explained, "it may even have been that 'Charbucks' would strengthen the positive impressions of Starbucks because it brings to the attention of consumers that the 'Char' is absent in 'Star'bucks, and, therefore, of the two 'bucks,' Starbucks is the 'un-charred' and more appealing product." *Starbucks*, 588 F.3d at 110–11.[8] In words that should equally be said of this case, the Second Circuit concluded, "We will not assume that a purportedly negative-sounding junior mark will likely harm the reputation of the famous mark by mere association when the

---

[8] *See also* Jake Linford et al., *Trademark Tarnishmyths*, 55 Ariz. St. L.J. 609, 674 (2023) (detailing study concluding that "contrary to the underpinnings of the tarnishment doctrine, associating well-known marketplace brands" with theoretically tarnishing "messaging produced not a tarnishment effect, but a small yet reliable burnishment effect").

survey conducted by the party claiming dilution could have easily enlightened us on the matter." *Id.* at 110.

**3.      Failure to account for parody.** Finally, Simonson failed to account for the parodic nature of the "Bad Spaniels" toy. Parody naturally tarnishes by "juxtaposing an irreverent representation of the trademark with the idealized image created by the mark's owner." *Haute Diggity Dog*, 507 F.3d at 260 (quotation omitted). Because "parody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation," the parody must be able to "conjure up at least enough of that original to make the object of its critical wit recognizable." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 588 (1994) (cleaned up).

As cases have recognized, when the product itself is parodic, there must be some breathing room because the parody does not necessarily reap what its object has sown. For instance, in *Hogg Wylde*, the Tenth Circuit rejected claims that a line of jeans for plus-size women parodically called "Lardasche" (complete with a cartoon pig on the pocket) was tarnishing to the "Jordache" mark. *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482 (10th Cir. 1987). Although the Tenth Circuit easily found that the public would associate "Lardasche" with "Jordache," it found no actionable harm: "If the public associates the two marks for parody purposes only and does not associate the two sources of the products, appellants suffer no actionable injury." *Id.* at 1491. Here, of

27

course, the district court found no likelihood of confusion as to source, and JDPI has not challenged that ruling.

Similarly, the Second Circuit held in *Hormel* that in parody cases direct competition is an "important, even if not determinative, factor," and accommodations must be made for parody especially where the "parody is part of the product itself" and not an attempt to sell competitive goods. *Hormel*, 73 F.3d at 507–08. The court found it critically important that Spa'am the Muppet puppet pig was not used "in order to sell more of its competitive products; rather the parody is part of the product itself." *Id.* at 508. Stated simply, without using Hormel's canned-ham mark, "the joke is lost." *Id.*

In light of parody's need to borrow enough elements of the original, playful parody marks should be tarnishing only where they either use "identical, or almost identical, trade names on different products," *Hogg Wyld*, 828 F.2d at 1491, or are used by a competitor "with both an incentive to diminish the favorable attributes of the mark and an ample opportunity to promote its products in ways that make no significant alteration." *Hormel*, 73 F.3d at 508 (quotation omitted). Neither was true here

28

## II. The TDRA tarnishment provision constitutes impermissible viewpoint discrimination in violation of the First Amendment.

### A. JDPI fails to justify the district court's holding that VIP waived its constitutional challenge.

JDPI's brief bypasses the bulk of VIP's arguments showing that the district court's finding of waiver was wrong as a matter of law. JDPI Br. 47–55. Instead, JDPI offers a generic abuse-of-discretion analysis. *Id.* at 54. But where a district court has found that a defendant waived an affirmative defense, this Court reviews that decision de novo. *See, e.g.*, *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).

Even applying the general principles of *Enyart v. National Conference of Bar Examiners*, 630 F.3d 1153, 1159 (9th Cir. 2011), on which JDPI relies, this Court should consider the merits of VIP's constitutional challenge. *Enyart* requires that (1) the district court identified the correct legal standard and (2) the district court's application of that standard was not illogical, implausible, or without support in the record. *Id.* The district court satisfied neither requirement.

1. The district court failed to correctly identify the permissible timeline for raising affirmative defenses. As VIP explained in its Opening Brief, the district court erroneously relied solely on Federal Rule of Civil Procedure 8(c). VIP Opening Br. 64–68. This Court has recognized that in considering affirmative defenses, courts should not follow form over

29

function, *see id.* at 63, but JDPI fails to engage with this Court's precedent.

Instead, JDPI argues that the district court's "rule has been embraced by the Supreme Court and is well-rooted in this Court's cases," JDPI Br. 48, but those cases are easily distinguishable because they dealt with *fact-heavy* affirmative defenses. *See, e.g.*, *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008) (statute of limitations); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118–19 (9th Cir. 2022) (express consent). In contrast, this case raises a pure issue of law—a facial challenge to a statute's constitutionality. *See* VIP Opening Br. 65–66; *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982) (permitting pure issue of law to be raised by motion "where the defense's existence can be judged on the face of the complaint").

In fact, the only Supreme Court decision JDPI cites recognizes that identification of an affirmative defense is only "typically" required at the pleading stage. *John R. Sand & Gravel*, 552 U.S. at 133. Nothing in the Supreme Court's jurisprudence prevented the district court from considering the issue or this Court from applying its "liberaliz[ation]" of the "requirement that affirmative defenses be raised in a defendant's initial pleading." *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984); *see Healy Tibbitts Constr. Co. v. Ins. Co. of N. Am.*, 679 F.2d 803, 804 (9th Cir. 1982) (permitting insurer to advance new affirmative defense in summary judgment motion). JDPI has cited no case that requires VIP to

30

have raised its constitutional issue in its answer, particularly when *Tam* and *Brunetti* had not been decided when JDPI filed its answer, and the district court insisted that any attempt to amend on remand would have been futile. SER-13.

The district court also failed to make any finding of prejudice, which is uniformly required to find waiver of an affirmative defense. *See Healy Tibbitts*, 679 F.2d at 804 (finding no prejudice where affirmative defense "was discussed by [plaintiff] in its opposition to the motion for summary judgment"); *Rivera*, 726 F.2d at 566; *Owens*, 244 F.3d at 713. JDPI was not prejudiced by VIP's argument on a purely legal issue that was thoroughly briefed by the parties and competing amici. JDPI argues that had JDPI attempted to amend its answer, it "would have opposed" on the basis of "prejudice," JDPI Br. 50, but it has never explained the nature of the prejudice. JDPI states only that it has spent years litigating its dilution claim, JDPI Br. 53—as if it would have abandoned that claim if VIP had raised its constitutional challenge in its answer.

2.     The district court's application of Rule 8(c) was illogical, implausible, and without support in the record. This is true for many of the same reasons that JDPI faced no prejudice—JDPI had already briefed the issue, so there was no concrete detriment to its interests, and the issue is purely legal. Further, a finding of waiver is not logical given that, as VIP addressed before the last remand and in its Opening Brief, VIP could have raised the constitutional challenge for the first time on

31

appeal, without ever having raised it in the trial court. VIP Opening Br. 66–67. JDPI offers no justification in these circumstances for looking back to an answer filed in 2015 when the legal defense is based on Supreme Court decisions in 2017 and 2019.

**B. Dilution by tarnishment is unconstitutional because it facially discriminates based on viewpoint.**

**1. Section 1125(c) facially prohibits speech based on viewpoint.**

While the first appeal to this Court was pending, the Supreme Court held, by a majority opinion for the first time, that viewpoint-based restrictions on trademarks are unconstitutional regardless of the level of scrutiny applied. *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). Despite that stark legal reality, JDPI, its amici, and the Government insist that the tarnishment provision is viewpoint neutral. But that argument ignores the provision's actual language. Section 1125(c) prohibits use of any mark whose similarity to a famous mark "harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). JDPI urges that a "Bad Spaniels" toy that offends or mocks can be enjoined but, under § 1125(c)'s clear language, a burnishing use—perhaps one playing on the notion that "Jack" is everyone's best friend just as much as a faithful canine—is not subject to the same restriction. That is paradigmatic viewpoint discrimination. As Professor Lisa Ramsey concludes in her new book, "US trademark dilution law conflicts with the First Amendment because it

32

discriminates based on viewpoint by banning uses of the famous mark that are inconsistent with the trademark owner's brand message." Lisa P. Ramsey, *Trademarks and Free Speech: Conflicts and Resolutions* 201 (2026).

"[G]overnment regulation may not favor one speaker over another." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). The fact that a trademark is involved matters not because "trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (cleaned up) (quoting *L.L. Bean, Inc. v. Drake Publ'rs, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987)). But that is what § 1125(c) does: it permits positive speakers and silences negative speakers.

Offending or mocking self-serious brands *is itself* a viewpoint. *See Am. Freedom Def. Initiative v. King County*, 904 F.3d 1126, 1131 (9th Cir. 2018) (citing *Matal v. Tam*, 582 U.S. 218, 243 (2017)). No injunction can stop conveyance of that viewpoint consistent with the First Amendment. *Brunetti*, 588 U.S. at 396 ("[A] law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." (quoting *Tam*, 582 U.S. at 223)); *see also Campbell*, 510 U.S. at 592 (explaining that "parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically" (quotation omitted)). That § 1125(c) bars a broad swath of negative viewpoints—

33

anything that can "harm" the famous mark—does not make it viewpoint neutral. The Supreme Court has long rejected the notion that public discourse "is not skewed so long as multiple voices are silenced" as "simply wrong." *Rosenberger*, 515 U.S. at 831–32.

Clinging to the fiction of viewpoint neutrality, JDPI relies on two far-afield cases, *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee ("SFAA")*, 483 U.S. 522 (1987), and *Vidal v. Elster*, 602 U.S. 286 (2024). But those cases both highlight truly viewpoint-neutral restrictions: statutes that respectively bar use of a particular word or a person's name without consent. The bar on the use of the word "Olympic" in *SFAA* applies regardless of whether the speaker was pro- or anti-Olympics, thus rendering any effects on First Amendment interests "incidental." *SFAA*, 483 U.S. at 537, 539–40. Similarly, the restriction in *Elster* prohibits registration of another person's name without his or her consent, "[n]o matter the message a registrant wants to convey." *Elster*, 602 U.S. at 293–94. The restriction on registration would bar "Trump just right" in the same way it barred "Trump too small." Those statutes are agnostic as to message.

### 2. JDPI's conception of tarnishment would eliminate parodic marks.

There are no "'built in' First Amendment accommodations" in § 1125(c), as JDPI claims, JDPI Br. 56, because it is impossible to conceive of a parodic mark that does not harm the reputation of its

34

target—that's the point of parody. *See Campbell*, 510 U.S. at 592 (explaining that parody may properly "kill[] demand for the original"). Trademarks may be commercial but very "often have an expressive content." *Tam*, 582 U.S. at 239. That is always true when the trademark has the capacity to tarnish. To permit nonparodic marks while barring any parodic marks would be favoring nonparodic viewpoints and disfavoring parodic viewpoints in a manner barred by the First Amendment. *Brunetti*, 588 U.S. at 394 ("[T]he statute, on its face, distinguishes between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation. The statute favors the former, and disfavors the latter.").

## C. Section 1125(c) has nothing to do with the quality of goods.

To avoid the consequence of a statute that is facially viewpoint-based, JDPI and its amici urge that tarnishment includes "shoddy goods" rather than speech. That is not supported by the language of the TDRA or any well-reasoned precedent under that federal statute.

Section 1125(c)(2)(C) says nothing about the quality or workmanship of goods. The statute permits injunctions against a junior mark whose similarity "harms the reputation of the *famous mark*"—not the reputation of the mark holder. 15 U.S.C. § 1125(c)(2)(C) (emphasis added). The statute targets tarnishing *trademarks* that send the message

35

that the famous mark is not really a reliable indicator of quality. To the extent that the famous mark's owner is not concerned about that expression of a negative viewpoint, its remedy is a confusion-based claim for infringement or a distinctiveness-based claim for dilution by blurring. Claims of shoddy goods are the province of consumer-protection laws, not the TDRA.

Although JDPI and amici list state-court cases that apply this "shoddy goods" theory under the banner of tarnishment, none of those cases involved the TDRA or § 1125(c). They concerned dissimilar state anti-dilution statutes or common-law causes of action and did not analyze "tarnishment" under § 1125(c). *See, e.g.*, *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 42 (2d Cir. 1994) (interpreting state statute that prohibited *inter alia* "dilution of the distinctive quality of a mark"); *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 557 (2d Cir. 2002) (remanding FTDA claims for procedural reasons and analyzing state-law tarnishment claim).

Courts' imprecise use of the word "tarnishment" under various state laws has caused some courts to improperly import into TDRA cases language regarding quality of goods from these state-law cases. *See Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 460 (S.D.N.Y. 2017) (conflating *Deere*'s analysis under New York statute as coextensive with TDRA); *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1044–45 (E.D. Wis. 2018) (relying on *Deere* and infringement cases for

36

tarnishment analysis). There is no well-reasoned authority supporting the proposition that the TDRA's tarnishment cause of action is viewpoint neutral because it targets "shoddy" goods.

## CONCLUSION

The Court should reverse the district court's judgment for JDPI as to tarnishment, vacate the permanent injunction, and remand with instructions to enter judgment for VIP.

DATED this 2nd day of March, 2026.

DICKINSON WRIGHT PLLC

s/ Bennett Evan Cooper
Bennett Evan Cooper
David G. Bray
Vail C. Cloar
Alexandra Crandall
1850 N. Central Avenue, Suite 1850
Phoenix, Arizona 85004

Attorneys for VIP Products LLC

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because it contains 6,947 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Century Schoolbook.

DATED this 2nd day of March, 2026.

s/ Bennett Evan Cooper